658 So.2d 755 (1995)
Roland B. DONAVAN, III, et ux., Plaintiff-Appellee,
v.
Marlin S. JONES, et al., Defendant-Appellant.
No. 26883-CA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 1995.
*758 James M. Edwards, Hayes, Harkey, Smith & Cascio by Charles S. Smith, Monroe, Rankin, Yeldell, Herring & Katz by Richard A. Bailly, Bastrop, for appellant.
Johnson & Placke by Don H. Johnson, West Monroe, for appellee.
Before SEXTON, NORRIS and LINDSAY, JJ.
NORRIS, Judge.
The State of Louisiana, Department of Transportation and Development (DOTD) and Riverwood International (Riverwood) appeal a judgment finding them 10 percent and 40 percent at fault, respectively, in causing the collision between the plaintiff-pedestrian, Roland Donavan, and defendant-motorist, Marlin Jones. Donavan answered the appeal urging the court erred in finding him 25 percent at fault in causing the accident. Jones and his insurer were allocated the *759 remaining 25 percent of fault, but did not appeal. For the following reasons, we amend the decree as to costs but otherwise affirm.

Facts
At the time of the accident Donavan, an Alabama resident, was working as a boilermaker general foreman for BE & K Construction Company. BE & K was hired by Riverwood to repair a recovery boiler at the Riverwood plant located on the east side of La. Highway 34 in West Monroe.
When Donavan arrived at the plant, he was instructed to park in an unimproved dirt lot (filled with potholes) on the west side of Highway 34; Riverwood designated this area for contractor employee parking. To get from the parking lot to the plant, the contractor employees had to cross Highway 34, a rather substantial thoroughfare. The once 35 mph two-lane highway had been expanded by the state in 1983 to five lanes (two northbound and southbound lanes and a center turning lane); a traffic volume of 3,000-12,000 vehicles per day is required for a five-lane highway. Shortly thereafter, the speed limit was raised to 45 mph based on the average speed (42-43 mph) that 85 percent of motorists were traveling in the area (known as the "85 percentile speed").
In late 1984, Riverwood became concerned about its contractor employees who were crossing at widely varying points along the busy highway (referred to as "random crossings") and contacted the DOTD about installing a crosswalk. Joel Williams, the district traffic operations engineer for the Department of Highways, recalled meeting with "someone" from the company to discuss the matter; that person's identity remains unknown. Williams and the Riverwood representative decided to place the crosswalk on the far south end of the parking lot; by this design, northbound cars on Highway 34 would turn left into the parking lot a few feet before the crosswalk and southbound cars would actually drive over the crosswalk and then make a right turn into the parking lot. Williams selected the safety devices to use at this crosswalk location. He knew the crosswalk, located in the middle of a block rather than at an intersection and spanning a 45 mph, five-lane roadway, was "unique"; he had never seen or installed one like it. In all, the crosswalk consisted of two painted white lines, six inches wide and 15 feet apart; advance pedestrian warning signs about 500 feet from the crosswalk on each approach; and two pedestrian crossing signs at the crosswalk itself, one facing north and the other south. Williams felt the signs and striping adequately defined the crosswalk, and alerted motorists to the presence of pedestrians.
In designing the crosswalk, he followed the Manual of Uniform Traffic Control Devices (MUTCD) insofar as it specified striping and signing, but used no other safety devices and took no further precautions beyond those of the MUTCD. The manual, however, did not address Riverwood's arrangement where contractor employees had to cross a large, busy, 45 mph highway at night. Williams conceded he knew that options besides signing and striping were available (such as pedestrian traffic signal, crosswalk lighting, and reduced speed limit signs) but he did not believe conditions warranted them. Williams also admitted he knew pedestrians would be using the crosswalk in the dark, and that lighting would have enhanced their visibility to passing motorists, but does not recall suggesting this option to the Riverwood representative. In Williams's opinion, lighting was not necessary; there was no policy or mandate in the MUTCD for lighting a crosswalk, and he had never lighted one in the past.
Donavan had been working at Riverwood for two days before the accident occurred. He testified he did not know the crosswalk existed, but conceded that because of the location of his motel, he must have driven over the crosswalk on his way to and from Riverwood. On Donavan's third day, he arrived for the first time when it was still dark, around 5:30 am. The evidence is undisputed that there was no lighting on the roadway, crosswalk or parking lot; the plant itself was brightly lit, but the testimony shows this most likely distracted drivers. Donavan wore his standard work clothes, a denim shirt and jeans. He parked his car and *760 followed the obvious straight path across the highway, guided by a light on the guard house near the plant entrance. Testimony and photographs revealed that these "random crossings" at locations near the crosswalk occurred frequently. Harry Potts and William Wheeler, two other BE & K employees who witnessed the accident, testified that they knew about the crosswalk, but did not use it either; they found it easier and more convenient to walk straight across the highway from their cars to the plant entrance.
Donavan testified that he cleared the first two lanes of southbound traffic and stopped in the center turning lane because he saw the headlights of one northbound car approaching in the far lane. According to Potts and Wheeler, it was very difficult to cross all five lanes at once; those using that parking lot typically crossed two lanes and used the center turning lane as an area of refuge to await northbound traffic. Donavan testified he took only a few steps into the inside northbound lane, angling slowly toward Jones's vehicle so he could walk behind it as it passed. He glanced down for a moment and when he looked up the car struck him.
According to Jones, he was traveling about 40 mph in the outer northbound lane when he saw Donavan about to step into his lane of travel. He quickly switched to the inside lane in order to pass behind him. Unfortunately, Donavan jumped backwards into the inside lane and collided with the right front bumper. No yaw or skid marks were present, suggesting that Jones made an abrupt but controlled lane change. The evidence is undisputed that Jones obeyed the posted speed limit and that he hit Donavan some feet north of the crosswalk. The precise point of impact is unknown.
Potts and Wheeler witnessed the accident from the curb near the parking lot. They testified that Jones suddenly changed lanes and struck Donavan; Donavan flew over the hood, smashed into the windshield and landed face down on the pavement. Wheeler testified he could see that Donavan's right leg was severely broken; it was twisted upwards at a grotesque angle and his foot lay near his shoulder. Potts and Wheeler carried him to the east side of the highway. Both testified that Donavan was well within the inside northbound lane when struck; the evidence corroborates this.
At trial, Donavan presented the testimony of Dr. John Glennon, a consulting engineer specializing in highway safety, accepted by the court as an expert in traffic engineering, highway design, and accident reconstruction. According to Dr. Glennon, a crosswalk spanning a five-lane, 45 mph highway is "unusual," and presents a great hazard; 45 mph is "very high" for a pedestrian crossing. R.p. 968, 970. He explained that pedestrians travel 2 to 5 feet per second and cars travel 66 feet per second. The higher the speed traveled, the less time and distance a motorist has available to avoid a pedestrian in the road. Moreover, pedestrians are bad judges of the "closing rate" of vehicles.
Dr. Glennon testified that the primary goal in designing a crosswalk is to provide adequate visibility for both the pedestrian and motorist; the highway width, speed, traffic volume, as well as the crosswalk's nighttime use, and mid-block location, should all be considered. The design principle used to help engineers provide drivers with sufficient time to see an object and react safely is known as "stopping sight distance." According to Dr. Glennon, to allow proper stopping sight distance without supplemental lighting at night, motorists using low beam headlights illuminating 200 feet ahead, must travel 30 mph or less. Assuming the motorist is traveling 45 mph at night using only headlights for illumination, and further assuming a perception-reaction time (time it takes to perceive that the object is a hazard, decide on a course of action and begin to implement it) of 2.5 seconds, a motorist would need 400 feet for proper stopping sight distance. According to Dr. Glennon, under the instant facts, Jones would have seen Donavan only 3 seconds before impact, and begun to react to the hazard only 50 feet away; he could not have stopped in time. Dr. Glennon testified that the 45 mph speed limit is a hazard in light of the circumstances in the instant case. Neither signs nor markings can change the distance at which the motorist can see the pedestrian. The traffic control devices used by the DOTD did not give motorists enough *761 time to see pedestrians crossing the road in the dark. In fact, Dr. Glennon classified this crossing as one of the most dangerous he has seen in 30 years.
Engineering sources and safety devices, according to Dr. Glennon, were available to the DOTD and should have been used to make the crossing safe. Dr. Glennon testified that the DOTD's general responsibility to provide safety to the motoring public includes the responsibility of lighting the crosswalk area when circumstances require it. The MUTCD is not the only guide to designing crosswalks; it does not address all situations and, in fact, did not address the one at issue. Dr. Glennon listed numerous other sources (guides and policy manuals) dealing with lighting for instance, including those published by the American Association of Highway and Traffic Officials (AASHTO), that are available to and should be used by traffic engineers. Dr. Glennon believed the primary cause of this accident was the lack of adequate visibility; Jones simply could not see Donavan in enough time to avoid him.
Regardless of the condition of the crosswalk, Dr. Glennon opined that pedestrians were not likely to use it anyway. Accessibility and convenience to the pedestrians must be considered as well. Given the large parking area, he would not expect pedestrians to use the crosswalk unless they were somehow guided to it. One commonly used method is fencing the lot to channel people to the spot where the crosswalk is located. Moreover, he considered this particular parking lot a "hostile pedestrian environment." In his opinion, the darkness of the parking lot and its poor condition (large potholes) contributed significantly to pedestrians choosing to avoid walking through the lot to the crosswalk; their only other options would be to walk along the highway to the crosswalk, creating further danger, or to simply walk directly across the highway, which many chose to do. Not only would lighting the parking lot enhance motorists' visibility and allow pedestrians to see the crosswalk, according to Dr. Glennon, but it would also signal activity on the west side of the highway, increasing a motorist's expectation for encountering pedestrians.
Riverwood's evidence consisted of testimony by Don Tatum, the Vice-President of Engineering at Riverwood, and Dr. Richard Glen Robertson, accepted as an expert in the fields of traffic engineering, roadway design and accident reconstruction. Tatum testified that the Engineering Department at Riverwood is responsible for ensuring the safety of contractor employees parking in the west side lot. Tatum knew of no duty on the company's part to light the parking lot or crosswalk, and in fact, believed that the law prohibited the company from lighting the highway right-of-way. Tatum knew that contractor employees were making dangerous random crossings; however, he admitted the company did nothing, apart from consulting with Williams of the DOTD, to prevent them from crossing at other points along the highway or to keep them on the crosswalk. Tatum conceded that channeling these employees was possible, but he rejected the idea because of "difficulties" that would be encountered in directing them to the same driveway used by vehicles entering the parking lot.
Dr. Robertson testified that he could not "pin down" a number on Jones's reaction time because it varies between motorists in different situations, but agreed that another expert's (Jones's accident reconstructionist, Alfred Gonzales) estimate of 1.5 seconds perception-reaction time was within a reasonable range. Dr. Robertson used an average of one second perception-reaction time and a speed of 40 mph, and concluded that Jones had ample time to stop before hitting Donavan. He testified that evading the pedestrian by switching lanes was also reasonable, but conceded that Jones had insufficient time to safely complete this maneuver. Dr. Robertson explained that based on the results of traffic engineering studies, a person's average perception-reaction time for unexpected situations is about .9 second to one second. From a design standpoint, however, rather than a reconstructionist's view, the crosswalk and safety measures should allow for maximum safety. The AASHTO design standard is typically two seconds, with a maximum of 2.7 seconds, for motorists to respond to a simple, unexpected situation. As noted by *762 Dr. Glennon, AASHTO also requires stopping sight distances of 325 to 400 feet under the circumstances. Dr. Robertson conceded that if a motorist traveling at 45 mph using only headlight illumination needed two seconds to react, he could not stop in time for a pedestrian crossing the highway; under this "worst case scenario," the crosswalk fell below acceptable standards. R.p. 1464.
As opposed to Dr. Glennon, Dr. Robertson testified that the most important requirement in designing crosswalks is to provide advance warning. According to Dr. Robertson, the signs and striping at this location accomplished this. Although he had never seen a crosswalk design for this particular set of circumstances in any engineering resources, he felt that the engineering judgments made in the instant case were reasonable.
Nevertheless, Dr. Robertson could not deny inadequate visibility's part in the accident. Dr. Robertson believed that illuminating the crosswalk would have enhanced its safety. He also suggested fencing and lighting the parking area, educating the workers about the crosswalk, or placing signs directing them to the crosswalk as other feasible options for improving the situation.
Jones also presented an accident reconstructionist, Alfred Gonzales. Upon viewing the evidence, Gonzales found that Jones was probably traveling about 40 mph and struck Donavan near the divider line of the northbound lanes approximately 60 to 80 feet north of the crosswalk.
Gonzales estimated that based on a speed of 40 mph and a perception-reaction time of 1.5 seconds, Jones first saw Donavan about 175 to 180 feet south of the point of impact. In light of these figures, Gonzales believed that had Jones applied absolute maximum braking, he could have stopped before hitting Donavan. Of course, a motorist would not know that he could stop in time, and thus an evasive maneuver is expected and reasonable. Obviously, however, there was insufficient time for evasive action. Gonzales admitted that 1.5 seconds was only a minimum, and the factors in this case (no lights, Donavan's dark clothing) would more than likely have increased this time; in other words, Jones may actually have had less time to take evasive action. He conceded that using the design standard of two to three seconds would increase the time a motorist would need to decide upon and initiate a course of action. In contrast to Dr. Glennon, Gonzales felt that 45 mph was a "moderate" speed for a crosswalk area.

Trial Court's Findings
The court rendered judgment in favor of Donavan and against all defendants. In written reasons, the court articulated the basis for each party's liability. Riverwood knew about the dangerous random crossings and knew or should have known that contractor employees, many whom were not familiar with Riverwood's facilities, continued to take the shortest and most obvious route across the highway even after the DOTD installed the crosswalk; yet the company failed to take reasonable preventative measures (such as relocating the parking lot, improving its surface, lighting it, installing channeling fences directing contractor employees to the crosswalk, or lighting the crosswalk area to draw the attention of motorists to pedestrians and of pedestrians to the crosswalk) to eliminate the known hazard. Thus, Riverwood breached its duty to provide a safe employment premises for its contractor employees. As noted, the court found Riverwood 40 percent at fault.
The DOTD's liability is based on its statutory duty to maintain the public roads and highways in a reasonably safe condition. La. R.S. 48:21. Citing the testimony of Dr. Glennon, plaintiff's traffic engineering expert, the court concluded that placing a mid-block crosswalk on a five-lane 45 mph highway presents obvious and significant problems, particularly to pedestrians crossing in the dark, which the state failed to recognize and accommodate in its engineering design. Based on Dr. Glennon's testimony that the design speed for this crosswalk at night is no more than 30 mph with only vehicular illumination, the court concluded that this crosswalk was unsafe for crossing at night and posed an unreasonable risk of harm to pedestrians. The DOTD had numerous, reasonable *763 options available, such as lowering the speed limit, lighting the area, or installing a pedestrian traffic signal, but chose none. Because these safety devices were not provided, Jones had insufficient time to react safely. In sum, the court found that the DOTD, though fully aware of the scope of the problem presented by the crossing, failed to provide a reasonable solution. Thus it found the state was legally responsible, and allocated 10 percent fault, for contributing to the occurrence of the accident.
Finally the court found that Donavan, a pedestrian crossing the highway a considerable distance from the crosswalk, breached his statutory duty to yield the right-of-way to all vehicles upon the roadway. La.R.S. 32:213A. The court accepted the eyewitnesses' version of the events, and concluded that Donavan was well within the inside northbound lane and about 25 to 50 feet north of the northernmost crosswalk line when Jones hit him. He deliberately left a position of relative safety and walked out onto the highway in the face of oncoming traffic. As noted, the court assessed him 25 percent of the fault. The remaining 25 percent of fault was assessed to Jones for his failure to exercise proper care to avoid hitting Donavan.
The court awarded Donavan $228,000 in general damages; $36,774.22 for medical expenses; $213,184 for past lost wages; and $547,385 for future loss of earnings. Reduced by 25 percent for his own fault, Donavan's damages totalled $769,007.42. Costs were allocated 50 percent to Riverwood, and 25 percent each to the DOTD and Jones.
Riverwood and the DOTD have appealed, contesting the court's findings as to liability and apportionment of fault; Riverwood also seeks reapportionment of court costs. Donavan has answered the appeal alleging the court erred in finding him comparatively negligent.

Applicable Law
Legal responsibility in tort claims is governed by duty-risk:
(1) Was the defendant's conduct a cause-in-fact of the harm?
(2) What, if any, duties were owed to the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk of harm caused within the scope of the protection afforded by the duty breached?
Mundy v. Dept. of Health and Human Resources, 620 So.2d 811 (La.1993); Faucheaux v. Terrebonne Consol. Govt., 615 So.2d 289 (La.1993). Cause-in-fact is generally a "but for" inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct is a cause-in-fact of the injury. Fowler v. Roberts, 556 So.2d 1, 5 (La.1989). When multiple causes are present, defendant's conduct is a cause-in-fact when it is a factor generating plaintiff's harm. Rick v. State of Louisiana, Through the Dept. of Transp. & Dev., 93-1776, 93-1784 (La. 1/14/94), 630 So.2d 1271. The existence of a duty is a question of law. Faucheaux, supra. The breach of the duty is a question of fact. Mundy, supra. Negligence is only actionable where it is both a cause-in-fact and legal cause of the harm. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980).
Once the DOTD assumes a duty to protect others, it may be liable for negligent breach of that duty. Rick v. State, supra; Harris v. Pizza Hut of La., Inc., 455 So.2d 1364 (La.1984). This duty of protection must be performed with due care. Harris v. Pizza Hut, supra.
The DOTD is legally required to follow the MUTCD. La.R.S. 32:235 A. Compliance with the provisions of the manual is only prima facie proof of a road authority's absence of fault. La.R.S. 32:235 E; Hatcher v. State, Through Dept. of Transp., 467 So.2d 584 (La.App. 3d Cir.), writ denied (but remanded on other grounds), 471 So.2d 724 (1985). Mere compliance, however, will not shield the DOTD from liability in every case. Humphries v. La. Dept. of Public Works, 545 So.2d 610 (La.App. 3d Cir.), writ denied, 548 So.2d 1249 (1989). Prima facie proof is sufficient only if not rebutted or contradicted. Humphries, supra at 616.
Generally, "the owner or operator of a facility has the duty of exercising *764 reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm." Mundy v. Dept. of Health and Human Resources, 620 So.2d at 813, and citations therein. This duty extends to employees of independent contractors, for whom the owner must take reasonable steps to ensure a safe working environment. Dupre v. Chevron U.S.A., Inc., 20 F.3d 154, 157 (5th Cir.1994); Boudreaux v. Exxon Co., U.S.A., 451 So.2d 85 (La.App. 3d Cir.), writ denied, 458 So.2d 119 (1984). As an owner of property abutting a highway, an employer may be liable for causing or contributing to a defective or dangerous condition in the area, despite the fact that a public authority is charged with maintaining the highway. Lenoir v. Sewerage and Water Bd., 535 So.2d 490 (La.App. 4th Cir.1988), writ denied, 540 So.2d 332 (1989); Ford v. City of Shreveport, 165 So.2d 325 (La.App.2d Cir.1964).
A pedestrian has the duty, when crossing a roadway at any point other than a marked crosswalk or at an intersection, to yield the right-of-way to all vehicles upon the roadway. La.R.S. 32:213 A. A pedestrian must exercise reasonable care and avoid moving from a position of safety into the path of an oncoming vehicle. Bacle v. Wade, 607 So.2d 927, 933 (La.App.2d Cir.1992); Bennett v. State, Through Dept. of Transp. & Dev., 503 So.2d 1022 (La.App.2d Cir.), writs denied, 505 So.2d 58 (1987).
Louisiana recognizes comparative fault. La.C.C. art. 2323. The Supreme Court has set forth the following factors for comparing the parties' fault:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985).
A court of appeal may not set aside a trial court's or jury's findings of fact in the absence of clear or manifest error. Stobart v. State, Through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). The Supreme Court has announced a two-part test for reversing a factfinder's determinations:
(1) [t]he appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
(2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Mart v. Hill, 505 So.2d 1120 (La.1987). A reviewing court may not merely review the record for evidence to support or controvert the trier of fact's findings, but rather, must review the record in its entirety to determine whether the findings were clearly wrong or manifestly erroneous. Stobart v. State, Through Dept. of Transp. & Dev., supra. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed. Lewis v. State, Through Dept. of Transp. & Dev., 94-2370 (La. 4/21/95), 654 So.2d 311; Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). Allocation of fault is also a factual determination subject to the manifest error rule. Theriot v. Lasseigne, 93-2661 (La. 7/5/94), 640 So.2d 1305, 1313; Reid v. State, Through Dept. of Transp. & Dev., 25,778, 25,780 (La.App.2d Cir. 5/4/94), 637 So.2d 618, 624, writ denied, 642 So.2d 198; Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La. App.2d Cir.1984).

Liability: DOTD
The DOTD contends that the court erred in finding that the crosswalk it designed, installed and maintained was unsafe for crossing at night, created an unreasonable risk of harm to pedestrians, and that this negligence contributed to the accident. It urges that Donavan's negligence alone caused the accident.
The trial court concluded that the DOTD knew the scope of the problem presented by the random crossings, failed to *765 provide a reasonable solution, and that this was a cause-in-fact of the accident. The record clearly shows that the DOTD's failure to use adequate safety devices, installing a pedestrian traffic signal, reducing the speed limit or lighting the crosswalk area, made the crosswalk area unsafe at night and was a cause-in-fact of the accident. Wheeler and Potts both testified that it was hard to cross all five lanes without running; many times they were forced to stop midway and wait in the turning lane. Both men, though vaguely aware of the danger in crossing such a large highway, believed that passing motorists could at least see them, even in the dark, standing in the roadway. The realization that motorists, in fact, could not see them at night struck Potts after seeing the car hit Donavan. Potts stated in deposition that the accident "made me more aware and conscious of how dangerous [the crossing] was, you know; that people obviously couldn't see you." Potts Dep., p. 29.
Dr. Glennon testified it was unusual to see a pedestrian crosswalk on this type of roadway; more elements of hazard were involved. He noted that a wider roadway takes longer to cross thus increasing the time the pedestrian is exposed to traffic; it would be highly unlikely for a person to clear all five lanes without encountering traffic from either direction. The lack of a pedestrian traffic signal certainly contributed to the danger. The high speed also presented a danger to motorists because it increased the amount of time a driver needs to avoid a collision. A motorist driving at night using only his headlights and traveling at 45 mph could not see a pedestrian in enough time to take reasonable evasive action; a speed limit of 30 mph or less is needed for adequate visibility. In addition, Dr. Glennon testified that lighting the crosswalk area would have solved the problem by allowing the motorist to see the pedestrian from a greater distance, thus giving him more time and distance to avoid him. In sum, Dr. Glennon felt that the 45 mph speed limit combined with only headlight illumination constituted a hazard and resulted in a very dangerous situation for both pedestrians and motorists.
No expert testified that the safety devices used at this crosswalk gave Jones sufficient time to see the pedestrian and complete an evasive maneuver. In fact, Williams and Dr. Robertson agreed that lighting would have improved visibility and safety. Because the DOTD did not employ the necessary safety devices, Jones could not see Donavan soon enough to avoid hitting him. The DOTD's failure to provide adequate visibility at night and to allow motorists sufficient time to react to pedestrians crossing the highway in the dark was a factor in generating Donavan's harm. Thus, the trial court was reasonable and not plainly wrong to conclude that the DOTD's actions and omissions were a cause-in-fact of the accident.
There is no question that the DOTD owed a duty to design and construct a safe crossing for Riverwood's contractor employees. Williams's uncontroverted testimony established that the DOTD undertakes the responsibility to install crosswalks and accompanying safety or warning devices in response to appropriate requests. In this case, Riverwood asked the DOTD to install a safe crossing for its contractor employees, specifying that they would be crossing both day and night. Regardless of the number of accidents at this location, the DOTD obviously recognized the risk to contractor employees because it assumed the duty to install a crosswalk for these employees. Harris, supra. Once it assumes this duty, the DOTD must discharge it in a reasonable manner and with due care. Rick, supra; Harris, supra.
The next inquiry is whether the DOTD negligently breached its duty to Donavan. The DOTD contends it discharged its duty because its crosswalk design complied with the MUTCD's minimum requirements. On the contrary, we find that Donavan successfully rebutted the DOTD's prima facie proof by establishing that the manual upon which Williams relied did not contemplate safety measures for a crosswalk that would be used at night and which spanned a busy, five-lane, 45 mph highway. See Humphries, supra.
Moreover, the record evidence shows that the DOTD negligently breached the duty *766 owed to Donavan. The DOTD knew or should have known that crossing the highway in the dark presented a substantial risk of harm to the contractor employees. Williams candidly admitted he knew the crosswalk would be used in the dark, and that the speed limit and numerous lanes made the highway more hazardous than usual to cross. Yet, in designing the crosswalk, the DOTD failed to take into account and protect contractor employees against the unusually hazardous circumstances at the Riverwood plant. The design omitted any consideration of nighttime use. The DOTD failed to light the crosswalk area and reduce the speed limit to assure motorists had adequate visibility and sufficient time and distance to avoid colliding with a pedestrian. The DOTD's failure to install the proper safety measures at this crosswalk location constituted a breach of its duty to Donavan.
The DOTD urges its duty does not extend to the risk that a contractor employee crossing near the crosswalk in the dark would be struck by a motorist. We disagree. The DOTD seeks to limit its liability to the 15 foot area between the crosswalk lines; this proposition is clearly untenable under the circumstances. Pedestrian warning signs posted 500 feet ahead of a crosswalk alert motorists to the possible presence of pedestrians in the area. Similarly, crosswalk lighting and reduced speed limit signs in the crosswalk area would provide motorists with adequate visibility and advance warning of pedestrians in the crosswalk and its immediate area. On this record, we do not find the trial court was plainly wrong to hold the DOTD liable for its negligent action which was both a cause-in-fact and legal cause of Donavan's resulting harm.

Riverwood
Riverwood contends it owed no duty to Donavan, and that if it did, it properly discharged that duty. Like the DOTD, Riverwood urges Donavan's negligence was the sole cause of the accident.
The first inquiry is whether Riverwood's negligence was a cause-in-fact of the accident. Riverwood not only knew about the hazardous crossing situation, but also required the contractor employees to cross the highway to access the plant entrance. The most obvious and effective solution was to eliminate the need to cross the highway. Nevertheless, several other options would have enhanced safety: lighting the parking lot, improving its surface, lighting the crosswalk area, and installing channeling fences. Riverwood's failure to take necessary safety measures was a factor in generating the accident. In sum, the trial court was not plainly wrong to find that Riverwood's conduct was a cause-in-fact of the accident.
Riverwood owed Donavan the duty to exercise reasonable care for his safety and not expose him to unreasonable risks of injury or harm. Mundy; Dupre, supra. This duty extends to employees of independent contractors for whom the owner must take reasonable steps to ensure a safe working environment. Dupre v. Chevron U.S.A., Inc., supra. Don Tatum admitted that Riverwood, through its Engineering Department, had a duty to protect the contractor employees.
Nevertheless, Riverwood strenuously argues it had no duty to Donavan that would require it to light or control a state highway; this duty properly lies with the state. The DOTD's statutory duty to maintain the highway, however, does not relieve Riverwood of its responsibility, once it designates a parking lot across a major highway for contractor employees, to provide them with reasonably safe access to the work premises. Riverwood contributed substantially to the dangerous condition. See Lenoir v. Sewerage and Water Bd., supra; Ford v. City of Shreveport, supra.
Having found that Riverwood owed a duty to Donavan, we must decide whether the company breached that duty. Apart from contacting the DOTD to install a crosswalk, Riverwood took no action to assure its contractor employees knew about the crosswalk and used it. Many of these employees, like Donavan, were non-residents and were not familiar with the facility; they did not know the crosswalk existed. Moreover, the testimony of Dr. Glennon established that given the conditions existing at Riverwood, it *767 was obvious that contractor employees would not use the crosswalk. Reaching the crosswalk at night required walking over unfamiliar and hazardous territory, an unlit, pothole-filled parking lot, as opposed to simply walking straight across the highway, guided by the light on the guard house at the plant entrance; the latter option was clearly more attractive. In addition, because the crosswalk was placed at the far south end of the parking lot, most contractor employees would have to walk south to the crosswalk and then double back once across to reach the plant entrance. The trial court was not plainly wrong to find that Riverwood's failure to take reasonable safety measures to ensure the safety of its contractor employees constituted a breach of its duty to Donavan.
Furthermore, the risk that Donavan would be struck by a motorist in this manner was clearly within the scope of protection contemplated by Riverwood's duty. Riverwood's negligent conduct was both a cause-in-fact and legal cause of Donavan's accident. On this record, the trial court was not manifestly erroneous to hold Riverwood partly liable for Donavan's harm.

Donavan
The trial court found that Donavan was also negligent and that his negligence was a cause-in-fact and legal cause of the accident. We agree. Donavan's standing in the highway in the face of an oncoming vehicle was clearly a cause-in-fact of the accident. Because Donavan did not use the marked crosswalk, he had a duty to yield the right-of-way to all vehicles on the highway. La.R.S. 32:213 A. Donavan admitted that he saw Jones's car approaching in the far lane, yet he deliberately walked into the inside lane of traffic to wait for the car to pass. The evidence shows that Donavan did not yield the right-of-way to Jones. Instead he left a position of relative safety, the center turning lane, and began walking slowly towards Jones's car; Donavan did not step directly in front of Jones's car, but Jones testified that Donavan would have been directly in front of him had he continued walking at that pace. Donavan clearly failed to use reasonable care and moved from a position of safety into the path of Jones's vehicle. Bacle v. Wade, supra. Donavan's breach of his duty was substantially related to his accident and resulting harm. We find no manifest error in the trial court's conclusion that Donavan was negligent and partly at fault in causing the accident.

Allocation of Fault
In comparing the fault of Riverwood and the DOTD, the trial court found that both had knowledge of the danger, but assessed Riverwood with greater fault, 40 percent, because it had more control over and knowledge of the situation as it unfolded. The court set the DOTD's fault at 10 percent for failing to make the crosswalk area reasonably safe for pedestrian traffic at all hours. The court found Donavan 25 percent at fault because he failed to determine that it was safe to cross before stepping out into a lane of traffic.
Applying the Watson factors we note that Riverwood, the DOTD and Donavan were all aware of the danger in crossing such an expansive, 45 mph highway in the dark. Both Riverwood and the DOTD knew that contractor employees were crossing at various locations along the highway and sought to alleviate the danger involved. Despite the installation of the crosswalk, however, the risk to pedestrians crossing in the dark remained great. The DOTD took insufficient measures to ensure that motorists were alerted to and had adequate visibility of pedestrians in the crosswalk area during the nighttime or early morning hours. The DOTD could have avoided the danger by lighting the crosswalk or reducing the speed limit in the area, and Riverwood could have notified its employees of the existence of a crosswalk, lighted it, and guided them safely to it, lighted the parking lot, or even moved the contractor parking to an alternate lot. The failure to provide these reasonable safety measures created a significant risk of harm to employees parking on the west side of the highway.
On this record, the trial court was entitled to find that Riverwood had a superior capacity to avert the danger. After all, it observed the hazardous situation on a daily basis and *768 thus had the opportunity to contact the DOTD again for further assistance or to undertake remedial measures on its own. The court was also entitled to find the DOTD's capacity inferior, on the record presented; it could not control Riverwood's choice of parking area, and it did purport to comply with the MUTCD. Under the circumstances, allocating fault 40 percent to Riverwood and 10 percent to the DOTD is not unreasonable. We perceive no manifest error. Mart; Towns, supra.
The court divided the remaining 50 percent equally between Donavan and Jones. Donavan did not step directly in front of Jones's car; however, he imprudently left the center turning lane and walked toward the approaching vehicle. In addition, the trial court was not unreasonable in concluding that Jones's action, abruptly switching lanes and striking Donavan, was as much a cause of the accident as Donavan's standing in the road. We note that although Donavan was in a "relatively" safe position in the turning lane as compared to standing and waiting in an actual lane of traffic, the inherent danger in standing in the turning lane is obvious. Yet, Riverwood's placement of the parking lot for these contractor employees gave them no choice; the evidence clearly showed that it was almost impossible to cross all five lanes without stopping in the center. Complicated by the fact that motorists were unable to see pedestrians in the dark standing in the highway, even those persons standing in the turning lane had a significant chance of being hit by a passing motorist. While we may have allocated fault differently if sitting as the trier of fact, on this record we cannot say that the trial court was clearly wrong to assign only 25 percent of the fault to Donavan. Theriot v. Lasseigne, supra; Rosell v. ESCO, supra. The trial court's allocation of fault will therefore be affirmed. Towns, supra.

Court Costs
Riverwood assigns as error the trial court's failure to allocate costs in proportion to each party's respective percentage of fault. The court divided costs among the defendants, splitting plaintiff's portion between Riverwood and the DOTD. La.C.C.P. art. 1920 vests great discretion in the trial court to assess costs; however, its discretion is not unlimited. LeBlanc v. Opt, Inc., 421 So.2d 984 (La.App. 3d Cir.1982). The trial court provided no explanation for assessing costs disproportionately to the allocation of fault. Under the circumstances, we see no reason to deviate from the usual allocation of costs. See Broussard v. Delchamps, Inc., 571 So.2d 855 (La.App. 3d Cir.1990).

Conclusion
For the reasons expressed the judgment is amended to reflect the reapportionment of trial court costs; in all other respects it is affirmed. Costs of appeal are assessed in accordance with each party's fault. La. C.C.P. art. 2164.
AMENDED AND AFFIRMED.
LINDSAY, J., concurs in part, dissents in part and will assign reasons.
SEXTON, J., concurs in the result.
LINDSAY, Judge, concurring in part and dissenting in part.
Although I concur in the majority's finding of a breach of duty on the part of all defendants, nevertheless, I believe the trial court and the majority are clearly wrong in the percentages of fault assessed to the plaintiff and the defendant, Riverwood International, USA, Inc. It is clear that the assessment of plaintiff's fault should be significantly increased, and that of Riverwood decreased. The plaintiff knew or should have known that it would be difficult for any motorist to see him during hours of darkness in his dark clothing as he proceeded across the roadway in the path of the only car on the highway. He crossed two travel lanes and the center turning lane. He moved from a position of relative safety in the center turning lane into the next travel lane and continued walking to a position which placed him directly in the path of the Jones vehicle. He was not even watching for traffic immediately prior to being struck by the Jones vehicle. Further, the plaintiff could have crossed the highway at the crosswalk, but he declined to do so. His fault in causing his own injuries should *769 have been assessed at no less than 40 percent.
As to the defendant, Riverwood, I concur with the majority in finding that it breached its duty to the plaintiff in failing to provide a sufficiently safe work place, i.e., the placing of the parking lot across a wide highway and failing to provide, along with the state, adequate safety features. Nevertheless, under the particular facts of this case, an assessment of 40 percent fault is clearly erroneous. Riverwood's passive negligence, although creating a risk of harm to the plaintiff, did not contribute more than 25 percent to the accident which was caused primarily by plaintiff's own negligence and inattentiveness.
In all other respects, I concur in the majority opinion.