620 So.2d 811 (1993)
Jenera MUNDY
v.
The DEPARTMENT OF HEALTH AND HUMAN RESOURCES, et al.
No. 92-C-3251.
Supreme Court of Louisiana.
June 17, 1993.
Dissent with Reasons filed June 30, 1993.
Julian R. Murray, Jr., Thomas P. Breslin, Jr., Chehardy, Sherman, Ellis & Breslin, Metairie, for applicant.
Philip H. Kennedy, New Orleans, for respondent.
Dissent with Reasons filed by Justice Watson, June 30, 1993.
MARCUS, Justice.[*]
Jenera Mundy filed this tort action against her employer, the Department of Health and Human Resources (Department), State of Louisiana, and Charity Hospital of Louisiana at New Orleans to recover damages for injuries sustained when she was attacked by an unknown assailant in an elevator at Charity Hospital in New Orleans. Plaintiff alleged that defendants were negligent in failing to provide adequate *812 security in the hospital and in failing to maintain a safe environment for employees, patients and visitors. The trial judge rendered judgment in favor of plaintiff against the Department[1] in the amount of $125,000, together with interest and costs, subject to a credit of $6,338.61 for compensation benefits paid by her employer. The Department appealed. The court of appeal reversed, finding that plaintiff was in the course and scope of her employment at the time of the incident and her exclusive remedy was in worker's compensation.[2] We granted certiorari and reversed, finding that the Department failed to prove that plaintiff was in the course and scope of her employment at the time of the incident and thus it was not entitled to tort immunity.[3] We remanded to the court of appeal to review the trial judge's findings on the issues of negligence and quantum. On remand, the court of appeal found that plaintiff failed to prove that the hospital was negligent.[4] On plaintiff's application, we granted certiorari to review the correctness of that decision.[5]
Plaintiff was employed by Charity Hospital as a licensed practical nurse and had worked the 11 p.m. to 7 a.m. shift for about ten years. At the time of the incident, she was working the evening shift in the dialysis department located on the eleventh floor of the hospital. On the evening of November 13, 1986, plaintiff arrived at the hospital at approximately 11:20 p.m. and entered the hospital through the pediatric emergency room entrance on the first floor of the east wing of the hospital as was her customary procedure. She testified that there were a lot of people in the hallway near the entrance. She proceeded down the hall and turned left to the east bank elevators. Plaintiff testified that two security guards were usually standing near the elevators when she arrived but on this evening they were not present. While waiting for the elevator plaintiff noticed people walking in the area and by the telephones which were nearby.
After plaintiff entered the elevator and just as the doors were closing, a man "jumped" in the elevator and pushed the second floor button. As the man was leaving the elevator on the second floor, he turned suddenly and attacked plaintiff with a knife. A struggle ensued in which the assailant attempted to pull plaintiff off the elevator. Plaintiff pressed the alarm button on the elevator, expecting a signal to go off and someone to come onto the speaker in the elevator, but nothing happened. During the struggle, plaintiff received knife wounds on her back, neck, chest and left hand. Finally, during his attempt to pull plaintiff off the elevator, the assailant fell backward off the elevator and the elevator doors closed. Plaintiff then pressed the seventh floor button and sought assistance.
The defense presented the testimony of Robert Coleman, hospital police captain in charge of the night shift security at Charity Hospital for about fifteen years. In November of 1986, he had about twentyfive persons working the night shift under his supervision. He testified that some security personnel had specific posts or assignments while others were roving personnel. All visitors to the hospital were supposed to receive a routing slip or visitors pass and one of the duties of security personnel was to check persons for a slip or pass.
Coleman testified that the east bank elevators where this incident occurred was not one of the post assignments. However, when he had extra personnel, he would place them in the lobby of the east and west bank elevators, and this would occur about two or three nights a week. Besides the post assignments, the hospital security provided routine patrols and an escort service *813 upon request for employees leaving the premises.
Coleman further stated that about 1500 to 2500 employees would enter and leave the hospital during a change of shifts. There are several entrances that both employees and visitors can use to enter and exit the hospital. At the time of the incident, someone was posted at the pediatric entrance (where plaintiff entered the premises) which is down the hall from the east bank elevators. While Coleman was aware of assaults and other problems occurring near the emergency room, he testified that he did not know of any prior assaults occurring near the east bank elevators. Coleman testified that the hospital routinely discarded incident reports and security assignment sheets after one year. Thus, he did not have an incident report or a security assignment sheet from the night of November 13, 1986.
Clara Whitelow, an elevator console operator at Charity Hospital at the time of the incident, testified that while monitoring the operation of the east bank elevators from a panel on the second floor that evening, a buzzer and a flashing light went off under elevator number three around the time of the alleged incident. She spoke into the two way communication system asking if she could help someone but no one answered. She testified that the elevator was leaving the fourth floor and was on the first floor when she first noticed the signal.
Coleman further testified that on the night of the incident, the two roving security personnel had called in to the dispatcher after hearing a lady screaming around the eighth floor. Subsequently, there were several calls from different floors. The dispatcher sent someone to check and Coleman and another officer proceeded to the east side to check on the situation.
The issue presented for our review is whether the Department is liable to plaintiff for the injuries inflicted upon her by an unknown assailant in the elevator of Charity Hospital.
Plaintiff contends that the Department was negligent in failing to maintain a reasonably safe environment for the employees, patients and visitors of Charity Hospital, in failing to provide adequate security around the elevators in the lobby of the hospital and in failing to maintain the elevator alarm system in working order. For the reasons set forth below, we find that plaintiff failed to prove that defendant was negligent and we deny recovery.
In order to determine whether liability exists under the facts of a particular case, our court has adopted a duty-risk analysis. Under this analysis plaintiff must prove:
(1) the conduct in question was the cause-in-fact of the resulting harm
(2) defendant owed a duty of care to plaintiff
(3) the requisite duty was breached by the defendant
(4) the risk of harm was within the scope of protection afforded by the duty breached
Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289 (La.1993); Mart v. Hill, 505 So.2d 1120, 1122 (La. 1987). Whether a duty is owed is a question of law. Faucheaux, 615 So.2d at 292; Harris v. Pizza Hut of La., Inc., 455 So.2d 1364, 1371 (La.1984). Whether defendant has breached a duty owed is a question of fact. See Annis v. Shapiro, 517 So.2d 1237 (La.App. 4th Cir.1987). In general, the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm. St. Hill v. Tabor, 542 So.2d 499, 502 (La.1989); Harris, 455 So.2d at 1369; Walker v. Union Oil Mill, Inc., 369 So.2d 1043, 1047 (La.1979). The relationship of an employer to his employee gives rise to a similar duty. See Restatement (Second) of Torts § 314A comment (a) (1965). This duty does not extend to unforeseeable or unanticipated criminal acts by third persons. Harris, 455 So.2d at 1371. However, when a duty to protect others against such criminal misconduct has been assumed, liability may be created by a negligent breach of that duty. Restatement (Second) of Torts § 324A *814 (1965); Harris, 455 So.2d at 1371. Thus, the question presented here is not whether Charity Hospital had a duty to hire security guards since that duty was already assumed by the Department, but whether the security measures or procedures undertaken by the Department were reasonable. As stated in the Restatement (Second) of Torts § 344 comment (f) (1965):
If the place or character of his business, or his past experience, is such that he [the proprietor] should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.
Plaintiff contends that the hospital's alleged misconduct (its alleged breach of duty) was in not having two security guards posted in the lobby at the east bank elevators on the night that the assault occurred as well as the alleged malfunction of the elevator alarm. As a result of this alleged breach of duty, plaintiff was attacked by an unknown assailant. In order to prevail, plaintiff must show that Charity Hospital could have reasonably anticipated that a person intent on harming someone would enter the premises, jump in the elevator with plaintiff and stab her as the elevator proceeded upward and that Charity could have prevented the action. See Coblenz v. North Peters Parking, Inc., 533 So.2d 98, 101 (La.App. 4th Cir.1988).
At trial, plaintiff testified that she had worked the night shift for ten years, that she used the east bank elevators to get to her work station on the eleventh floor and that two security guards were usually stationed near the east bank elevators on the first floor, but on the night she was attacked, they were not there. Plaintiff offered no evidence that any other incidents or assaults had occurred in the area or on the east bank elevators involving any other employee, patient or visitor to show that security guards should be posted in the area at all times.[6] She offered no evidence of security procedures in other hospitals or business establishments similar to Charity Hospital in an attempt to prove that the security procedures undertaken by Charity were inadequate.
The testimony of Captain Robert Coleman established that at the time of the assault upon plaintiff in 1986, there were about twenty-five employees in night security. Security personnel were posted at certain places in the facility on a regular basis. The east bank elevators were not considered a regular night security post; nevertheless, guards were placed there two or three nights a week when the personnel were available. The established procedures provided for routine patrol in the lobby area and on the hospital floors. Hospital security would check persons for routing slips or passes. They provided an escort service for employees leaving the hospital upon request. Because of prior incidents that had occurred in or near the emergency room, guards were always posted there. Likewise, security was posted at the hospital's mental ward. Coleman had no personal knowledge of any prior assaults or incidents that had occurred in or around the east bank elevators.
We find that plaintiff's evidence of a single criminal incident at the east bank elevators is insufficient to conclude that the security measures undertaken by the Department were unreasonable or inadequate. Even accepting plaintiff's testimony, the record before us does not support a finding that the hospital knew or should have known that the east bank elevators posed an unreasonable risk of harm to anyone using them such that the hospital breached its duty owed to plaintiff when it failed to station security guards in the lobby of the east bank elevators. Plaintiff testified that she did not see the assailant prior to entering the elevator. Even when he "jumped" on the elevator as the doors *815 were closing on the first floor, plaintiff testified that this did not strike her as unusual because "a lot of doctors they do that, they wait until you're on the elevator and then here they come, they jump on the elevator." Thus, plaintiff did not contemplate that she was in any danger until the assailant was exiting the elevator on the second floor and when, without warning, the assailant suddenly turned around, pulled out a knife and began stabbing her. Hence, security guards posted at the elevators could not have prevented the attack that occurred in the elevator. Moreover, even assuming that the elevator alarm malfunctioned, this alleged failure was not a cause in fact of the injuries sustained by plaintiff in that an alarm would not have prevented the assailant from entering the elevator in the first place. The court of appeal stated it succinctly:
We agree that plaintiff's stabbing was a random, unforeseeable criminal attack that happened in a matter of seconds without the assailant's identity or motive ever being established. As such we cannot say that it could have been prevented by any security measure other than the permanent posting of a guard inside this elevator and within all of the elevators of Charity Hospital. Prior history did not require Charity Hospital to implement such a drastic security measure, and its failure to do so was not negligent.
609 So.2d at 915.
We conclude that plaintiff failed to prove that the Department breached its duty to plaintiff. Plaintiff did not show that the Department could have reasonably anticipated or necessarily prevented the assault upon her that occurred in the elevator. Based upon the evidence presented by plaintiff in this case, we cannot say that the security measures implemented by Charity Hospital were inadequate. Hence, the Department is not liable to plaintiff for her injuries. The trial judge was clearly wrong in holding otherwise. The court of appeal correctly reversed the judgment of the trial judge.

DECREE
For the reasons assigned, the judgment of the court of appeal is affirmed. All costs are assessed against plaintiff.
DENNIS, J., dissents with reasons.
WATSON, J., dissents and will assign reasons.
DENNIS, Justice, dissenting.
I respectfully dissent. In my opinion, there is reasonable warrant in the record and an appropriate basis in law for the trial court's decision that the hospital was negligent in failing to maintain a reasonably safe environment for its employees, patients and visitors.
WATSON, Justice, dissenting.
The court of appeal substituted its judgment for that of the trial court. I find no clear error in the trial court's decision that the hospital was negligent. The record shows that the usual security guards were missing from the east bank elevators and that the elevator alarm intercom system was not working.
Whether Charity Hospital was negligent in failing to provide reasonable security to its employees is largely a question of fact. The trial court resolved the question against the hospital. The majority and the court of appeal speculate that guards would not have prevented the attack; the trial judge concluded otherwise. Harris recognized the deterrent effect of visible, armed guards.
Additionally, the trial court could have reasonably inferred that a voice from the elevator speaker would have interrupted the struggle in which plaintiff was injured. If the elevator alarm had been working, the hospital could have promptly responded to the emergency and might have prevented at least some of the injuries.
There is a reasonable factual basis for the trial court's conclusion that the malfunctioning alarm system and the lack of security in the area breached the hospital's duty to provide a reasonably safe environment *816 for its employees, patients and visitors.
I respectfully dissent.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Ortique, J. (recused) was not on the panel which heard and decided this case. See the footnote in State v. Barras, 615 So.2d 285 (La.1993).
[1] The name of the Louisiana Department of Health and Human Resources was changed to the Louisiana Department of Health and Hospitals prior to judgment in this case.
[2] 580 So.2d 493 (La.App. 4th Cir.1991).
[3] 593 So.2d 346 (La.1992).
[4] 609 So.2d 909 (La.App. 4th Cir.1992).
[5] 613 So.2d 960 (La.1993).
[6] Plaintiff did subpoena all incident and/or investigative reports compiled by Charity Hospital in connection with this incident. As previously stated, Captain Robert Coleman, head of security at the time of the incident, testified that all records and investigative reports were routinely destroyed after one year. As a result, the incident report involving plaintiff was unavailable.