745 So.2d 641 (1999)
Bobby A. PATRICK, et ux., Plaintiffs-Appellees,
v.
EMPLOYERS MUTUAL CASUALTY COMPANY, et al., Defendants-Appellants.
No. 99-94.
Court of Appeal of Louisiana, Third Circuit.
August 11, 1999.
Writ Denied November 24, 1999.
*643 Jimmy Roy Faircloth Jr., Alexandria, for Bobby A. Patrick et ux.
John Gutierrez McLure, Alexandria, for Employers Mutual Casualty Co., et al.
Before DOUCET, C.J.; PETERS; and GREMILLION, Judges.
PETERS, J.
Charles E. Patrick died in the early morning hours of Friday, June 3, 1994, as *644 a result of a gunshot wound to his head, which he sustained while participating in a physical altercation in the parking lot of the Bayview Yacht Club (Bayview), an Alexandria, Louisiana bar. His parents, Bobby A. Patrick and Lavern C. Patrick, filed this action against The Centre Partnership (Partnership) and its liability insurer, Employers Mutual Casualty Company, to recover damages arising from their son's death. The Partnership is the owner of The Centre, the shopping center where the Bayview is located.
A jury trial resulted in a judgment in favor of the plaintiffs and against the defendants in the amount of $176,469.00. The defendants have appealed, asserting four assignments of error. The plaintiffs have answered the appeal, seeking a modification of the judgment regarding the apportionment of fault and an increase in damages. For the following reasons, we affirm the judgment in all respects.
The record contains an aerial photograph of the general area surrounding The Centre. The photograph reveals that The Centre is located on the southeast corner of Jackson Street and Dorchester Drive. At the intersection, Jackson Street runs generally in a northeast-southwest direction and Dorchester Drive traverses it at a ninety degree angle and thus runs generally in a northwest-southeast direction. The Centre consists of two rectangular buildings of approximately the same size separated by an opening referred to in the testimony as a breezeway. Based on the scale supplied with the aerial photograph, the buildings are approximately 150 feet by 100 feet in size. The wider side of one of the buildings primarily fronts Jackson Street and is identified in the record as "Building A." The wider side of the other building fronts Dorchester Drive and is identified in the record as "Building D." The configuration of the buildings is such that they form an L-shaped shopping center. Both buildings are partitioned to accommodate occupation by various commercial businesses, and each building is set off from the adjacent street, with parking areas and landscaped grounds occupying the set-off areas. The Bayview is located in Building D. At the time of the incident giving rise to this litigation, the Bayview was operated by RLN, Inc. (RLN), pursuant to a written lease agreement between it and the Partnership.
At the time of Patrick's death, the property immediately southeast of Building D was a vacant lot extending along Dorchester Drive for approximately 200 feet, or to the beginning of a parking lot servicing a banking facility. The bank and its parking area occupied the next approximately 175 feet along Dorchester Drive, or to a divided street which intersects Dorchester Drive from the southwest. Another bar, the Cotton Gin, was located on the corner on the opposite side of the intersecting street. The parking lot in front of the Cotton Gin opened onto Dorchester Drive as well as the intersecting street.
On the northeast side of Dorchester Drive, a small commercial building occupied the corner of its intersection with Jackson Street, and the frontage past that building southeast to immediately across the street from the intersection of Dorchester Drive and the aforementioned divided street constituted a large parking lot which serviced the MacArthur Village Mall, a shopping mall occupying a number of city blocks.
Although the Partnership owned The Centre complex, it delegated responsibility for the day-to-day operation to Tudor Enterprises through a management contract.[1] According to Gary Ryder, Tudor Enterprises' operations manager, his company's responsibilities toward The Centre included collecting rent, having the trash removed, repairing and maintaining the parking lots and buildings, arranging for lawn mowing and landscaping for the common areas, and providing limited security *645 for the premises. However, his company provided no security services relative to the Bayview's operation.
The Bayview was one of Building D's first tenants after its construction in the late 1970's, although at the time it was not operated by RLN. In fact, Richard Nunnally, the owner of RLN,[2] worked in the Bayview as a bartender when it first opened. He later formed RLN, through which he purchased the Bayview trade name and leased its location in The Centre from the Partnership. Nunnally testified that the terms of the lease resulted from negotiations with representatives of the Partnership and Tudor Enterprises over a period of a month but testified that the main substance of the negotiations related to the calculation of rent, and not security issues.
Under the terms of the lease, RLN leased only the space occupied by the Bayview in Building D. Article 12 of the lease provided in part that the parking lots and common areas remained "subject to the exclusive control and management of [the Partnership]," with the Partnership reserving the right "to establish, modify and enforce reasonable rules and regulations with respect to" those areas. (Emphasis added.) Additionally, this Article provided that, among other powers associated with the parking lots and other common areas, the lessor maintained the right "to police the same." (Emphasis added.) Under the lease, the Partnership maintained such a degree of control over the parking lots and other common areas that the Bayview could not even solicit business in those areas. Although the Partnership did reserve the right in Article 27 to require RLN to provide "professional security" during the Bayview's operating hours "to prevent vandalism of [the Partnership's] property," that provision was never invoked by the Partnership or the management company.
The act of violence that took the life of Patrick was only one of many incidents in the area requiring law-enforcement intervention. The records of the Alexandria City Police Department established that its officers responded to 474 calls in the general area of The Centre from April 1990 through December 1994.[3] Our review of the department records indicates that 12 calls concerned Cinema Six,[4] 17 concerned Schnack's in The Centre,[5] 243 concerned the Cotton Gin, and 192 concerned the Bayview. While the address responded to in each call constituted only a reference point for the responding officer and did not necessarily indicate that an incident had occurred at that location, it still was indicative of unlawful activity being reported within the area. Ryder testified that he was aware of past incidents resulting in injuries outside both the Bay-view and the Cotton Gin. His sources of information included property managers, security guards, eyewitnesses, and even the local news paper.
According to Nunnally, individuals eighteen to twenty-one years old comprised ninety percent of his business. His busy times were Fridays, Saturdays, holidays, and the summer months, but Nunnally was satisfied with the volume of each day's business. Sometimes he ran specials on Thursdays to compete with the Cotton Gin, and this increased the crowd for those evenings. He employed full-time bouncers to work the front door and inner section of *646 the Bayview, and sometimes during the busy holidays and summer months, he employed off-duty deputies to help with identification checks to keep minors from entering. The extra assistance corresponded with the influx of college students during these times. Nunnally recalled no weapons incidents at the Bayview prior to June 3, 1994, but he was aware of altercations occurring. Although he assumed no responsibility for providing security on the parking lot, if he saw a disturbance outside the Bayview he might try to stop it, but more often than not he would simply call the police.
According to Ryder, the only security efforts taken by Tudor Enterprises relative to The Centre occurred in mid-1992 in response to a problem created by young people congregating on The Centre's parking lots along Jackson Street.[6] For a short period beginning July 1, 1992, Tudor Enterprises employed off-duty deputies and instructed them that their limited purpose was to stop the cruiser activity. These officers patrolled the area on Friday and Saturday nights and were paid by Tudor Enterprises for their services. The cost was passed on to the Partnership and, according to Nunnally, was then passed on to the Bayview on a pro rata basis.
Deputy Sheriff Dennis Little of the Rapides Parish Sheriff's Department coordinated the deputies' schedules with Karen Lawrence of Tudor Enterprises. According to Deputy Little, he told Ms. Lawrence that the Bayview would require two officers on duty at the appropriate times, but she declined to approve two officers and told Deputy Little that she would speak with the appropriate representative of the Bayview. Nunnally testified that no one ever approached him about the issue. Deputy Little's instructions were to take care of anything from the breezeway between the two buildings, around the front of Building A, and to the backside of a small parking lot. He understood that it was not his purpose to monitor the parking lot for the Bayview.
As is seen from the area plat, the entrances to the Cotton Gin and the Bayview were slightly over 500 feet apart and within easy walking distance along Dorchester Drive. Because of their close proximity, it was not at all uncommon for patrons of one establishment to leave their vehicles in its parking lot and walk to the other, a fact which, according to Ryder, was well known to him.
Nunnally testified that Thursday, June 2, 1994, was a very busy night because it was the beginning of the summer. According to Nunnally, there were "probably 250 people" in the Bayview during the night, and at closing time in the early hours of June 3, the parking lot was full with at least 100 people outside at the time of the shooting. The incident giving rise to Patrick's death began as one group of young patrons of the Cotton Gin were walking back to the Bayview parking lot where they had earlier parked their car.[7]
The primary evidence concerning the altercation itself came from two sources, and the facts concerning certain critical aspects of the event are in dispute. Bobby Hunley, Jr., a long-time friend of Patrick testified on behalf of the plaintiffs, and David Miller testified on behalf of the defendants. Hunley's version is as follows:
He, Patrick, and Justin Marler had gone out together on the evening of June 2 and initially went to Fools Gold, another Alexandria bar located some distance from Jackson and Dorchester, arriving there at approximately 10:30 or 11:00 p.m. The three men left Fools Gold sometime thereafter with Hunley driving. *647 They made a swing through the Cotton Gin parking lot to observe the crowd and then continued to the Bayview. Their intention was to check out the crowd at the Bayview, determine which establishment appeared more inviting, and if the Cotton Gin was the better choice, to walk there from the Bayview.
As Hunley turned his vehicle into the parking lot servicing Building D at its southernmost entrance, the vehicle occupants observed David Miller and Jay Carruth standing in the parking lot with some girls, and words were exchanged between the young men. Hunley then proceeded to park his vehicle in the Building D parking lot, and the group with whom they exchanged words began walking in the same direction. As fate would have it, they unwittingly parked beside the car belonging to Miller. Patrick immediately exited the vehicle and entered into a verbal dispute with Carruth. Miller and one of the women (whom he described as Miller's wife) got into the vehicle parked next to his vehicle even before the altercation between Patrick and Carruth became physical.
The fight between Patrick and Carruth moved approximately twenty to thirty feet from the vehicles, and Hunley and Marler then exited the vehicle. As he exited the vehicle, Hunley found himself face-to-face with Miller, words were exchanged, and he struck Miller "two or three times," literally knocking him out with one of the blows. Hunley and Marler then started into the Bayview. As they did so, Hunley observed that Patrick had Carruth on the ground and had gotten the best of him. He called to Patrick to "leave [Carruth] alone" and join them in the bar.
Patrick released Carruth and started toward Hunley and Marler. At this point, Hunley observed Miller walking toward them with a pistol in his hand. Patrick knocked the pistol from Miller's hand, and a scramble ensued between Hunley, Marler, and Miller for possession of the weapon. In the meantime, Carruth had gotten off the ground and began hitting Patrick.
Miller won the scramble for the pistol, fired a warning shot, and began pointing the weapon toward Hunley and Marler. Hunley and Marler began to walk toward the Bayview's entrance. Hunley observed Miller walking toward Patrick and Carruth as they fought on the ground. He heard a second shot, but did not see the shot fired. As he turned around, he observed Patrick on the ground. He then ran into the Bayview and requested that someone call 911.
Miller testified to a different version of the altercation. His version is as follows:
Jeremy (Jay) Carruth is his wife's brother, who, on the night of the incident, was soon to be married. On that evening, Miller initially met Carruth and another individual named Jason McNeal at the Bayview. The men were later met by Miller's wife, Amy; by Carruth's fiancée, Kimberly; and by a family friend, Jill Powell. Sometime during the evening, but not necessarily at the same time, the six individuals found their way to the Cotton Gin, leaving their vehicles in the Building D parking lot. As the group left the Cotton Gin in the early morning hours of June 3, they intended to retrieve their automobiles and go home. Again, they did not leave as a group, but Carruth and Kimberly left initially, with Miller and Amy close behind. Miller was not a witness to the initial exchange of words at the parking lot entrance and became aware of problems only when he arrived at his automobile in the Building D parking lot. When he arrived at the parking lot, Miller observed McNeal and Patrick, not Carruth and Patrick, fighting, with Patrick obviously getting the best of McNeal. Miller reached down and touched Patrick's shoulder and said "[T]hat's enough. You've got him whupped." With that, the altercation *648 ceased, and Miller attempted to unlock the passenger door for his wife to enter the vehicle. As he attempted to unlock the door, Hunley approached him and said that he "was going to kick [Miller's] ass." Miller told Hunley he did not "want any trouble," but Hunley began to swing at him. During this altercation, Amy, who was pregnant, was struck by Hunley. Miller managed to unlock the passenger door and retrieve a pistol he kept under the driver's seat. With pistol in hand, he forced Hunley's retreat. About this time he heard Kimberly scream and saw Patrick, about thirty to forty feet across the parking lot, sitting on top of Carruth, hitting him in the face and bashing his head on the concrete.
Miller ran to where they were fighting, screaming the whole time for Patrick to stop. While running to the altercation, Miller chambered a round and fired a shot in the air. Patrick did not respond to the warning shot, and when Miller reached the scene of the conflict, he struck Patrick in the head with the pistol. The pistol discharged and the bullet struck Patrick in the head. He and his friends left the scene before the police arrived.
Patrick was taken to St. Frances Cabrini Hospital in Alexandria, where he was later pronounced dead. He never regained consciousness after being shot.
After trial, the jury responded to interrogatories by concluding that The Centre breached its duty to provide security for the premises, that this breach was a cause of Patrick's death, and that Patrick and Miller were also at fault in causing the death. The jury then fixed the percentages of fault as follows: Miller ten percent, Patrick thirty-five percent, and the Partnership fifty-five percent. The jury then awarded the plaintiffs $56,160.00 each in general damages for the wrongful death of their son and a total of $208,532.75 ($8,532.75 in special damages and $200,000.00 in general damages) for survival damages. After reducing the total award by the percentages of fault attributed to Patrick and Miller, the trial court then entered a judgment in favor of Bobby A. Patrick and Lavern Patrick, and against The Centre Partnership and Employers Mutual Casualty Company, in the amount of $176,469.00.
The defendants appealed asserting that the jury erred: (1) in finding that the Partnership had breached a duty owed to Patrick, (2) in its allocation of fault, (3) in granting an award for the survival action, and (4) in failing to limit Bobby Patrick's award to $10,000.00. The plaintiffs answered the appeal, asserting that the jury erred in rendering an "abusively low" damage award and in failing to apportion all of the fault to the Partnership.

Assignment of Error No. 1
In this assignment, the jury's conclusion that the Partnership breached its duty to provide security for The Centre is at issue. The defendants assert that the jury erred in finding that the Partnership breached any duty it might have owed to Patrick.
Under the duty-risk analysis applicable to a tort action, a plaintiff must prove four elements to establish liability: (1) the conduct in question was the cause-in-fact of the resulting harm, (2) the defendant owed a duty of care to the plaintiff, (3) the requisite duty was breached by the defendant, and (4) the risk of harm was within the scope of the duty breached. Mundy v. Department of Health & Human Resources, 620 So.2d 811 (La.1993). While the question of breach of duty is a factual one, whether a duty exists is a question of law. Id.
The law recognizes that a property owner has a general legal duty relative to the safety of persons on his premises to exercise reasonable care and to not expose such persons to unreasonable risks of injury or harm. Id. However, this duty does not normally extend to the protection of persons on the premises from unforseen or unanticipated criminal acts by third persons. *649 Id. Thus, the Partnership owed Patrick a duty of reasonable care to not expose him to the risk of foreseeable or anticipated criminal acts by third persons. The trial court properly instructed the jury about the existence of this duty.
The law also recognizes that the lessor/lessee relationship may give rise to additional duties on the part of the property owner. It recognizes that, although generally a lessor owes no legal duty to guests or invitees of a lessee to protect them against misconduct of third persons, the lessor may assume the duty to provide security. Hodge v. Liquid Ventures, 93-902 (La.App. 3 Cir. 3/2/94); 634 So.2d 1337. The trial court instructed the jury, without objection from the defendants, that under the terms of the lease agreement between the Partnership and RLN, the Partnership "assumed the duty of providing security for the premises." Therefore, in this case, the Partnership also assumed the contractual duty of providing security for The Centre during the Bayview's operating hours. While the lease agreement does not specifically state that the Partnership assumed the duty to provide security outside the Bayview proper, it so limits the Bayview's control over the parking lot and common areas that it amounts to an assumption of that duty. Because of this fact, coupled with the defendants' failure to object to the instruction, we will not disturb the trial court's instruction in this regard.
Once voluntarily assumed, a duty of protection "must be performed with due care." Harris v. Pizza Hut of La., Inc., 455 So.2d 1364, 1369 (La.1984). Due care means taking necessary steps to guard against any predictable risks of criminal activity. See Id. Thus, in this case, whether analyzed pursuant to either the reasonable-care duty owed as owner or the assumed-security duty owed as lessor, the question to be answered is whether the Partnership took any steps to guard against predictable risks of criminal activity on its premises and, if so, whether the security measures or procedures employed were reasonable. In addressing this question, we further note that the reasonableness of security measures or procedures may be affected by the purpose for which the premises are used. In Mundy, 620 So.2d 811, 814, the court stated:
As stated in the Restatement (Second) of Torts Sec. 344 Comment (f) (1965):
If the place or character of his business, or his past experience, is such that he [the proprietor] should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.
Additionally, "[w]hether violence which results from the breach of such a duty is reasonably foreseeable and a cause-in-fact of an injury to a third person is a jury question." Harris, 455 So.2d at 1369.
Because the breach-of-duty question is one of fact, it is subject to the manifest error analysis, and we may not disturb or set aside a jury's finding of fact unless we find it to be clearly wrong or manifestly erroneous. See Rosell v. ESCO, 549 So.2d 840 (La.1989). This means we are not to determine whether the jury was right or wrong in its factual determinations but rather to determine whether its factual determinations were reasonable ones. Stobart v. State, Dep't of Transp. & Dev., 617 So.2d 880 (La.1993). Where there is conflict in the testimony, reasonable inferences of fact and reasonable evaluations of credibility should not be disturbed even if this court feels that its own evaluations and inferences are as reasonable. Rosell, 549 So.2d 840.
As previously stated, Ryder was aware of past instances of violence in the area of the Bayview and Cotton Gin. He was also aware that patrons regularly traversed the 500 feet between the establishments. *650 Although both Deputy Little and Nunnally considered the area around the Bayview to not necessarily be dangerous, both men were aware of the inherent dangers of a bar-type establishment. When the subject of security for the Bayview was broached in his conversation with Ms. Lawrence, Deputy Little told her that effective security for the location required two deputies because "in a lounge type atmosphere like that it would be dangerous for one person to try to handle that." Additionally, there was general agreement among the witnesses that establishments that sell liquor to young people have out-of-the-ordinary characteristics and that physical altercations are a common result of the mixture of alcohol with young men and women.
Other than its efforts to alleviate the congregating problem in mid-1992, the Partnership took no steps directly or through Tudor Enterprises to provide security for any of The Centre complex. Anthony Potter, an Atlanta, Georgia security expert who testified for the plaintiffs, was of the opinion that the Partnership's response to its duty to provide security "was not reasonable in that they failed to provide any [security]." According to Potter, the nature of the Bayview's business and its proximity to the Cotton Gin were such that anyone providing area security should have performed a security audit to determine what measures or procedures, if any, were reasonable and necessary. He suggested that in performing this study, the Partnership should have acquired statistical information from law enforcement similar to that introduced at trial. He explained that, with this information, the Partnership could have analyzed the number and type of complaints lodged in the general area. It was Potter's opinion that, with that information in hand, the Partnership should have talked to the proprietors of the Bayview and the Cotton Gin as well as the other tenants in The Centre to obtain an overall picture of the possible security problems. Once this information was assimilated, the Partnership should have developed a security plan recommendation for its property manager and should have seen to it that the plan was implemented. According to Potter, the security audit is imperative because "[y]ou can't just make a decision to provide security because you may be providing the wrong kinds, you may be providing it at a time that it's not required and ... security costs money.... You have to have the facts in order to make an appropriate decision."
Potter testified that his interpretation of the Alexandria City Police Department records introduced into evidence indicated that, of the calls concerning the Bayview and Cotton Gin, 142 calls related to crimes against persons during the four years prior to the incident. He considered that figure significantly high. Additionally, the vast majority of these incidents occurred on Thursdays, Fridays, and Saturdays, and he was of the opinion that security was needed for these days. In his opinion, the internal security provided by the Bayview was not sufficient because "when you have a place serving alcoholic beverages like this particularly that caters to a younger crowd you're going to have people out in the parking lot, you're going to have altercations in the parking lot and in this particular situation you had a significant number of altercations in the parking lot." Potter suggested that initially two deputies should have been used to patrol the area because of the number of incidents. Once the officers had regained control of the situation, the number of deputies could be reduced to one. According to Potter, "[t]he whole concept of security is not to catch anyone. The whole concept of security is proactive. In other words keeping things from happening. A good security program means no incidents or very very few."
In his opinion, had the Partnership performed a security audit, it could have better understood the security problems it faced and could have supplied a security *651 presence, which would have deterred crime in the area and "significantly reduced the likelihood of the altercation" leading to Patrick's death. The jury obviously agreed that the Partnership's response to its security obligation was not reasonable. In other words, the act of violence perpetrated on Patrick by Miller was foreseeable, given all the information available to the Partnership, and the Partnership breached its duty to Patrick to exercise reasonable care in protecting him from such acts. We find no manifest error in those determinations. Finding that the Partnership breached its duty to provide security for the parking lot and common areas in front of the Bayview concludes our required analysis of the liability issue because the causation issues were not raised on appeal. Therefore, we find no merit in the defendants' first assignment of error.

Assignment of Error No. 2
In this assignment of error, the defendants challenge the apportionment of fault. The plaintiffs have answered the appeal, seeking relief on the same issue. The defendants seek a reduction of the fifty-five percent assigned to the Partnership, and the plaintiffs seek an increase of this assessment.
In allocating comparative fault, the court should consider the causal relationship between the conduct and the damage and the nature of the parties' conduct as determined by the following factors: (1) whether the conduct resulted from inadvertence, (2) the magnitude of the risk created by the conduct, (3) the significance of what was sought by the conduct, (4) the relative capacities of the actors, and (5) the existence of extenuating circumstances requiring haste. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). Additionally, an appellate court must find that the allocation of fault is clearly wrong before it can adjust the allocation up or down. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96); 666 So.2d 607.
We do not find any of the fault allocations to be clearly wrong. According to Ryder, the Partnership failed to provide security because it did not understand that its own contract required it to do so. Ryder testified that Tudor Enterprises involved itself in the lease negotiations with RLN because it recognized the nature of the Bayview's operation and the problems it might face. Despite recognizing this fact, the negotiated document resulted in a contract which severely limited the Bayview's access to the parking lots and common areas for any activity and maintained full control of those areas with the Partnership. By maintaining control over those areas, the Partnership retained its general duty of care and assumed a contractual duty to use reasonable care in protecting the patrons of The Centre. However, not only did the Partnership fail to determine what security might be needed, it also failed to provide security for The Centre's patrons. In failing to do so, it created the risk that something such as Patrick's death might result from the lack of security.
As to the assessment of fault to Patrick and Miller, the jury listened to conflicting testimony about how the incident occurred. Unfortunately, as is often the case with jury verdicts, this court does not have the advantage of knowing exactly which act or omission the jury concluded was sufficiently proven. If we conclude that the jury relied solely on the testimony of Hunley, then Miller would have been the obvious aggressor and more fault should be attributed to him. However, if the jury accepted Miller's version of the events, then clearly he should be attributed with minimum fault. The jury could have accepted parts of both Miller's and Hunley's testimony and rejected other parts and in doing so could have reached the conclusion it did without committing manifest error. Thus, we find no merit in this assignment of error or the assertions in the answer to the appeal as they relate to this issue.

*652 Assignment of Error No. 3
When a person dies due to the fault of another, leaving no surviving spouse or children, his parents acquire the right to recover all damages suffered by him prior to his death. La.Civ.Code art. 2315.1(A). Survival damages are properly awarded if there is even a scintilla of evidence of pain or suffering on the part of the decedent, and fright, fear, or mental anguish during an ordeal leading to the death is compensable. In re Medical Review Panel Bilello, 621 So.2d 6 (La.App. 4 Cir.), writ denied, 629 So.2d 1139 (La. 1993).
As with the last assignment of error, the testimony is in conflict regarding whether Patrick suffered any fright, fear or mental anguish during the ordeal. Miller's version of the events would suggest that Patrick did not see him approaching with the pistol but obviously should have heard the warning shot. Hunley testified that Miller and Patrick struggled over the pistol prior to the shooting. Only a scintilla of evidence of pain, suffering, fright, fear, or mental anguish is required to recover survival damages. It is clear under either version of the incident, that Patrick was at least aware that the pistol had been introduced into the conflict. Additionally, he was struck in the head and lived for a short period after the incident. Therefore, the jury could have found a scintilla of evidence sufficient to support the award. We cannot substitute our own evaluations and inferences if there exist reasonable inferences of fact by which the trier of fact might have reached a particular conclusion. See Rosell, 549 So.2d 840.
Damages awarded for wrongful death are general damages since the value of the loss is not subject to a pecuniary calculation. The standard for appellate review of a trial court's general damages award was set forth by the Louisiana Supreme Court in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994):
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Further, the supreme court stated in Andrus v. State Farm Mutual Automobile Insurance Co., 95-0801, pp. 8-9 (La.3/22/96); 670 So.2d 1206, 1210: "The threshold determination by either the court of appeal or this court is whether the amounts awarded by the trial court constituted an abuse of discretion, in either direction. The standard for that determination is both difficult to express and difficult to apply." In this case, we do not find that the amount awarded constituted an abuse of discretion, and we reject this assignment of error as well as the answer to the appeal directed at this issue.

Assignment of Error No. 4
In this assignment of error, the defendants contend that the award in favor of Bobby Patrick should be limited to $10,000.00 because he sold his interest in the matter for $10,000.00 during the pendency of the lawsuit. Specifically, the defendants assert that during the pendency of the lawsuit, Bobby Patrick had a judgment rendered against him and that as a result of that judgment, he filed a notarized act of sale for $10,000.00 concerning his interest in the lawsuit. The defendants contend that he later repurchased his interest for $10,000.00.
The defendants failed to bring this issue before the trial court until they filed their Motion for Judgment Notwithstanding the Verdict and Alternatively for a New Trial. The trial court denied the motion. La.Code Civ.P. art.1972(2) provides in part that a new trial shall be granted when the party has discovered, since the trial, evidence *653 important to the cause, which he could not have obtained before or during the trial with due diligence. In their motion, the defendants asserted that by affidavit signed June 28, 1996, and filed and recorded on July 11, 1996, in the mortgage records, Bobby Patrick sold his right in the suit for $10,000.00. Thus, the alleged sale and recordation occurred over a year and a half before trial, and there has been no showing that the alleged sale could not have been discovered with due diligence through appropriate discovery methods or through a check of the public records. Additionally, while La.Code Civ.P. art.1973 provides that a new trial may be granted if there is good ground therefor, we find no abuse of the trial court's discretion in denying the motion on this issue brought before it so late in the proceedings. We express no opinion on the merits of the defendants' claim.

DISPOSITION
For the foregoing reasons, we affirm the judgment in all respects and assess costs to the defendants.
AFFIRMED.
NOTES
[1] The management contract was not introduced into evidence.
[2] Neither the lease nor the record establishes Nunnally's exact position with RLN. He executed the lease on behalf of the corporation, but the instrument is silent as to the authority by which he did so. Nunnally is referred to in the record as the "owner" of the corporation and, therefore, the Bayview.
[3] This does not include the 360 responses to the MacArthur Village Mall generally, which may have included responses to the Bayview-Cotton Gin side of the mall.
[4] Cinema Six is a movie theater complex located in or adjacent to the MacArthur Village Mall and facing Dorchester Drive.
[5] Schnack's is a jewelry store located in Building A of The Centre.
[6] Ryder testified that teenagers (dubbed the "Jackson Street Cruisers") had begun to create problems all along Jackson Street in that they would park in the parking lots for no purpose other than to converse, drink, deposit litter, and otherwise create difficulties.
[7] While the record does not specify the ages of the various participants in the altercation giving rise to Patrick's death, it appears that all were in their early to mid-twenties.