802 So.2d 28 (2001)
Leonard J. WALLMUTH, et ux
v.
RAPIDES PARISH SCHOOL BOARD.
No. 01-0042.
Court of Appeal of Louisiana, Third Circuit.
May 16, 2001.
Writs Granted October 12, 2001.
*29 Kay A. Theunissen, Jennifer A. Wells, Lafayette, LA, Counsel for Rapides Parish School Board.
Terry Aubin, Attorney at Law, Pineville, LA, Counsel for Leonard J. Wallmuth, et al.
Court composed of HENRY L. YELVERTON, JOHN D. SAUNDERS, and JIMMIE C. PETERS, Judges.
YELVERTON, Judge.
The Rapides Parish School Board appeals a judgment which found it 100% liable for injuries sustained by Joshua Wallmuth while at school. For the following reasons we conduct a de novo review of the evidence as to liability. We find the School Board 70% at fault and the intentional wrongdoer 30% at fault.

*30 FACTS
Joshua was a seventh-grade student in 1996 at Jones Street Junior High School, now named Smith Junior High School in Pineville, Louisiana. The incident resulting in this suit took place during second hour PE on April 18 that year. Other than Joshua, three other boysNathaniel Smith, David Zeno, and Chris Davidson were involved in the incident.
The boys had been playing volleyball. Joshua was on one team, and the other three boys were on the opposing team. According to David, Coach David Brasher told the boys to hit the ball over the net only two times. David explained that Chris kept hitting the ball over the net after the two times. When Chris would hit the ball the third time, he hit it right to Joshua who would catch the ball rather than hit it. This made Chris mad at Joshua. Chris' team lost so they had to sit in the bleachers while Joshua's team played the other team. While they were sitting in the bleachers, Chris yelled out to Joshua that he was "going to get him" when they got in the locker room.
The injury occurred after the boys went to the locker room. Joshua testified that all three boys came in the locker room at the same time while he was getting dressed. He testified that David ran behind him and stood on the bench and was holding his shoulders and pulling his hair. Nathaniel punched Joshua one time. Joshua stated that Chris was standing on the side the whole time, and then all of a sudden, he ran up and kicked Joshua in the knee.
Nathaniel admits to being in the locker room and observing the incident, but denies that he even touched Joshua. David explained that when he got in the dressing room, he and Joshua started engaging in horseplay with Nathaniel eventually joining them. Nathaniel claims that Chris ran in and kicked Joshua in the knee.
Joshua's knee was injured. He had to be placed in a cast from the top of his hip down to his knee. For some time he was not able to participate in his regular sports activities. He will probably require surgery when the growth plate closes.
The Wallmuths sued the Rapides Parish School Board and its insurance company, Coregis Insurance Company. They amended their petition adding the parents and guardians of the three boys and one of the parents' homeowner's insurance carrier.
The claims against the Smiths, their insurer, and the Zenos were tried before a jury. The claims against the School Board, its insurer, and Chris were tried before the trial court. Chris was before the trial court because a preliminary default judgment had been entered against him, and the court had to decide whether to confirm the default judgment, a matter which cannot be tried by a jury. The trial court did not confirm the default judgment because there was no showing as to who was the proper person to sue regarding Chris, who was a minor.
The jury found that neither Nathaniel nor David were at fault in causing the damages to Joshua. The trial court found that the School Board was 100% liable for this accident and awarded damages in the amount of $88,062. It is from this judgment that the School Board appeals. The School Board contests its liability, and apportionment of fault, but not the amount of the award for damages.

STANDARD OF REVIEW
We will review the liability assignments de novo. The trial court declined to apportion any fault to Chris. The School Board claims that the trial court erred in *31 failing to assess any fault to Chris since he was the person who kicked Joshua and inflicted the injury. It specifically relies on Louisiana Civil Code Article 2323 which mandates that we determine the percentages of fault of all tortfeasors.
In Bell v. Ayio, 97-534 (La.App. 1 Cir. 11/13/98); 731 So.2d 893, writ denied, 98-3115 (La.2/5/99); 738 So.2d 7, the first circuit found that it was legal error for the trial court to fail to quantify fault against a student who was clearly at fault because she attacked another student and stomped her ankle causing injuries. See also Frazer v. St. Tammany Parish School Bd., 99-2017 (La.App. 1 Cir. 12/22/00); 774 So.2d 1227, writ denied, 01-233 (La.3/23/01); 787 So.2d 1001, and Wijngaarde v. Parents of Guy, 97-2064 (La.App. 4 Cir. 9/2/98); 720 So.2d 6, writs denied, 98-3144, 98-3152, 98-3162 (La.2/12/99); 738 So.2d 574, 575, where the first and fourth circuits held it was legal error to fail to quantify the fault of students who assaulted fellow students. We agree.
The trial court refused to assess any fault for the stated reason that "[t]his should not be interpreted in any way as to condone the behavior of Mr. Chris or the others, but rather it reveals the extent to which the School Board's behavior fell below the requisite standard of care demanded by the circumstances of this case." Manifestly, the trial court found that Chris was at fault for this accident. The trial court should have considered the conduct of the parties and the circumstances surrounding the conduct of each in the actual allocation of fault instead of refusing to assess any fault. Patrick v. Employers Mut. Cas. Co., 99-94 (La.App. 3 Cir. 8/11/99); 745 So.2d 641, writ denied, 99-2661 (La.11/24/99); 750 So.2d 987.
Chris was at fault in causing Joshua's injuries, and the refusal of the trial court to assess him with fault was legal error. "Where the trial court commits legal error by applying an incorrect legal standard, this court is required to determine the facts de novo from the entire record and render a decision on the merits." Bell, 731 So.2d at 897. Therefore, we will conduct a de novo review of fault. Our review of the record will not include a consideration of any comparative negligence of Nathaniel Smith or David Zeno, however, because the School Board has not requested that we review the jury's finding that they were not negligent. See La. Code Civ.P. arts. 1812 and 1917. Nor will we review the amount of the award of damages, for that has not been assigned as error.

SCHOOL BOARD LIABILITY
The School Board argues that Chris's actions were sudden, spontaneous, without warning, and clearly unanticipated by the School Board. It maintains that it acted reasonably in supervising the students. On the other hand, the Wallmuths claim that they established that there was an ongoing pattern of lack of supervision and misbehavior in the locker room throughout the year, and that the School Board breached its duty to put an end to this roughhousing and horseplay, which eventually resulted in Joshua's injuries.
A school board, through its agents and teachers, owes a duty of reasonable supervision over students. La. Civ.Code art. 2320; Adams v. Caddo Parish School Bd., 25,370 (La.App. 2 Cir. 1/19/94); 631 So.2d 70, writ denied, 94-684 (La.4/29/94); 637 So.2d 466. The supervision required is reasonable, competent supervision appropriate to the age of the children and the attendant circumstances. Jackson v. Colvin, 98-182 (La.App. 3 Cir. 12/23/98); 732 So.2d 530, writ denied, 99-228 (La.3/19/99); 740 So.2d 117. This duty does not make the school board the *32 insurer of the safety of the children. Id. Constant supervision of all students is not possible nor required for educators to discharge their duty to provide adequate supervision. Adams, 631 So.2d 70.
Before liability can be imposed upon a school board for failure to adequately supervise the safety of students, there must be proof of negligence in providing supervision and also proof of a causal connection between the lack of supervision and the accident. Id. "Injury from horseplay between discerning students which, at some stage may pose an unreasonable risk of harm to the participants, does not automatically and of itself render the supervising authority liable." Henix v. George, 465 So.2d 906, 910 (La.App. 2 Cir. 1985). Furthermore, before a school board can be found to have breached the duty to adequately supervise the safety of students, the risk of unreasonable injury must be foreseeable, constructively or actually known, and preventable if a requisite degree of supervision had been exercised. Id.
Michael Vercher, the principal at Jones Street when this incident occurred, agreed that the possibility for more discipline situations would be encountered in PE classes in the locker room as opposed to the classroom due to the fact that there is usually some horseplay. Coach Brasher agreed with Vercher's testimony, as did Barbara Joubert who taught the PE classes with Coach Brasher. Lee Dotson, assistant principal at Jones Street, also agreed with this proposition. Furthermore, both Coach Brasher and Ms. Joubert acknowledged that their physical presence in the locker room intermittently while the kids were changing was a deterrent to any horseplay.
Significantly, there was testimony from several students that similar events had been occurring in the boys' locker room for most of the year at Jones Street. Joshua testified that he would frequently see boys pushing or shoving into lockers, rolling around, throwing around, punching, hair pulling, or arm twisting.
Jeremy Jones testified that he was roughed up by several boys right before the Christmas holidays. He was hunched down in the corner while the boys were kicking and hitting him. He reported the incident to his grandmother whose testimony confirmed Jeremy's story. After that he switched schools.
Brian Coughlin, a seventh grader at the same time as Joshua, testified that boys were boasting about beating up different guys and indicating whose turn it was next. He saw Jeremy get roughed up by several boys. It later happened to him personally while he was getting dressed after PE class. Several boys approached him and pushed him over the bench. He pulled one with him, and then they started kicking him in his back and punching him. They left, and he finished dressing. He told his mother about it, who testified that she reported it to a Ms. Smith with the School Board.
One other student, Tyler Saucier, testified about boys whipping seventh graders with whips. However, his testimony is irrelevant because this occurred the year after the incident at question. At that time Joshua was in the eighth grade, and Tyler was in the seventh grade.
Ms. Coughlin testified that about two to three weeks after school started, her son told her that eighth graders were initiating seventh graders. Then around the Thanksgiving and Christmas holidays, her son told her that he was about to be initiated. She initially thought the initiations were boyhood pranks, but realized it was serious when Brian came home with a bruise on his back, so she reported it to *33 Ms. Smith who worked at the School Board office. Ms. Smith told Ms. Coughlin she would take care of it. When Ms. Coughlin got home, Mr. Vercher called and told her he was unaware of what had been happening. Ms. Coughlin told her that Mr. Vercher wanted to use Brian as a "snitch", i.e., he wanted Brian to tell him who was involved. Ms. Coughlin stated that Mr. Vercher told her that he was going to punish the whole PE class by making them take health. Joshua related that the class was required to take health and not dress out after one such initiation.
Mr. Vercher denied that he had any knowledge that there were daily fights in the boys' locker room. However, Assistant Principal Dotson admitted that he was advised that there were some problems in the locker room when he received calls from several parents. He denied that it was a daily event.
The evidence established that these incidents occurred in the back of the locker room which was not visible from the front of the locker room. A person had to actually go to the back of the locker room to observe anyone in that area. Coach Brasher was not in the locker room when any of these incidents occurred. Both he and Ms. Joubert agreed that their presence in the locker room would deter any kind of horseplay or other problems. Even Brian testified that if Coach Brasher was in the locker room, everybody got dressed and got out. However, as explained by Coach Brasher, he could not stay in the locker room the entire time the boys were changing because there were still children in the gym that did not dress out that he also had to supervise. He testified that he would make passes through the locker room to insure that everything was running smoothly.
Joshua testified that he hardly ever saw Coach Brasher in the locker room. Jeremy Jones stated that Coach Brasher was present in the locker room from time to time. Nathaniel agreed that on any typical day Coach Brasher was mostly in the gym while the boys were in the locker room getting dressed. He explained that Coach Brasher would usually come back there every day to let them know how much time they had left to dress. David also commented that Coach Brasher would check on the students in the locker room since he was dividing his time between the gym and the locker room.
The boys admit that they never told Coach Brasher about these incidents. Although they knew they were happening, they testified that they were fearful of retaliation if they disclosed what was happening. However, Mr. Dotson admitted that he knew there were problems, although maybe not the extent of the problems. We also believe that Mr. Vercher was notified of the situation after Ms. Coughlin approached the School Board. She testified that he told her there would be a health class as punishment, and Joshua's testimony substantiated that there was health class after one such event.
With this knowledge the school authorities should have notified Coach Brasher that it appeared there was an ongoing problem in the locker room, and he needed to exercise more supervision over that area. Seventh and eighth grade boys are at an age that, although they know better than to horseplay or rough up one another, they will still do it if given the opportunity. We find that the School Board failed to exercise reasonable supervision under the facts of this case. Therefore, we will examine the fault of the School Board and Chris in the incident since we are obligated under Article 2323 to allocate fault to all responsible parties.

*34 APPORTIONMENT OF FAULT
The factors to be considered when allocating fault among tortfeasors include those set out in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985):
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
With these factors in mind, it is our opinion that the majority of the fault should lie with the School Board. We realize that the School Board should not be held responsible for every altercation that occurs. Nonetheless, this case involved a pattern of rough housing in the locker room, which the School Board and school had notice was occurring. Although none of the boys themselves reported the incidents to any school officials, the School Board had notice from parents that there were problems. Even after Ms. Coughlin reported the particular facts about her son which resulted in a bruise on his back, there is no evidence that the School Board took any action to insure that there was increased supervision in the locker room so as to prevent future skirmishes. When there was supervision, there were no problems. It was inevitable that someone was going to be injured.
This does not exempt Chris from negligence. He was old enough to know that physically assaulting someone could lead to serious injury. There is no doubt that he intentionally kicked Joshua in the knee at a time when he knew Joshua would not be able to protect himself. It is the kick itself which caused the serious injury suffered by Joshua.
Therefore, we apportion the fault as follows. To the School Board, we assign 70% of the fault. We find Chris Davidson was 30% at fault in causing the injuries sustained by Joshua.
The Wallmuths have cited Pinsonneault v. Merchants & Farmers Bank, 99-12 (La.App. 3 Cir. 7/21/99); 738 So.2d 172, writ granted and remanded on other grounds, 99-2681 (La.2/4/00); 753 So.2d 842, for the proposition that 100% of the damages can be recovered from a tortfeasor who is the legal cause of 100% of the plaintiff's injuries. That case involved a fatal shooting by three robbers at a bank and held that:
while we are under mandate to quantify the fault of "all persons" contributing to the injury, even though intentional tortfeasors are not included in the list in Article 2323(A), we are not mandated to use the quantification of fault to reduce the [victim's] recovery. The intention of the drafters was not to penalize an injured party because of the intentional acts of a tortfeasor, but rather to avoid that result, as evidenced by Article 2323(C).
Id. at 198.
The incident in Pinsonneault occurred before April 16, 1996, the effective date of La.Civ.Code art. 2324. This incident occurred April 18, 1996, two days after the effective date of Article 2324. Now, pursuant *35 to Article 2324(B), a nonintentional tortfeasor is liable only for his own share of the fault. Therefore, the School Board is liable only for 70% of the damages in this case. We repeat that the amount of damages are not at issue in this case.
For these reasons the judgment of the trial court is reversed insofar as it failed to allocate fault to Chris Davidson, and amended in the assessment of fault to the School Board. Judgment is rendered finding fault on the part of Chris Davidson, and allocating 70% of the fault to the School Board and 30% of the fault to Chris Davidson. In all other respects the judgment of the trial court is affirmed. Costs of this appeal are assessed to the School Board.
REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.