Filed 11/13/17

# IN THE SUPREME COURT OF CALIFORNIA

ALEKSANDR VASILENKO et al., )
)
    Plaintiffs and Appellants, )             S235412
)
       v. )       Ct.App. 3 C074801
)
GRACE FAMILY CHURCH, )      Sacramento County
)  Super. Ct. No. 34-2011-00097580
    Defendant and Respondent. )
_____)

Plaintiff Aleksandr Vasilenko was struck by a car as he crossed a public street between the main premises of defendant Grace Family Church (the Church) and the Church's overflow parking area. Vasilenko contends that the Church owed him a duty of care to assist him in safely crossing the public street and that the Church was negligent in failing to do so. The Church argues that it had no control over the public street and therefore did not owe Vasilenko a duty to prevent his injury under the principle that landowners have no duty to protect others from dangers on abutting streets unless the landowner created the dangers. (See *Sexton v. Brooks* (1952) 39 Cal.2d 153, 157–158 (*Sexton*).)

The parties do not dispute that the Church did not control the public street and did not create the dangers on the street. But the Church, by locating its parking lot on the other side of the street and directing Vasilenko to park there, foreseeably increased the likelihood that Vasilenko would cross the street at that

1

location and thereby encounter harm. Thus the circumstances here are different from when a landowner merely owns property abutting a public street.

We conclude, however, that a landowner does not have a duty to assist invitees in crossing a public street when the landowner does no more than site and maintain a parking lot that requires invitees to cross the street to access the landowner's premises, so long as the street's dangers are not obscured or magnified by some condition of the landowner's premises or by some action taken by the landowner. Because Vasilenko does not allege that the Church did anything other than maintain a parking lot on the other side of that street, we find that the Church did not owe him a duty to prevent his injury.

## I.

The Grace Family Church was located on Marconi Avenue across from the Debbie Meyer Swim School in an unincorporated area of Sacramento County. Marconi Avenue was five lanes wide, with two lanes in each direction separated by a universal left turn lane. The nearest intersection to the Church was at Root Avenue, about 50 to 100 feet east; there were no traffic signals or crosswalks at the intersection. The Church had an agreement to use the swim school lot for overflow parking when the Church's main lot was full.

Vasilenko sought to attend a seminar at the Church on a rainy evening in November 2010. When he arrived, a church member volunteering as a parking attendant informed him that the main lot was full and told him to park at the swim school lot across the street. The attendant did not tell him where to cross Marconi Avenue to reach the Church and did not tell him that the Church had posted crossing volunteers at the intersection of Marconi and Root Avenues. Vasilenko, along with two others, attempted to cross in the middle of the block directly opposite the Church. Midway across, he was hit and injured by an oncoming car.

2

Vasilenko and his wife sued the Church for negligence and loss of consortium. He alleged that the Church created a foreseeable risk of harm by maintaining an overflow parking lot in a location that required invitees to cross Marconi Avenue, and that the Church was negligent in failing to protect against that risk. He also alleged that the Church was negligent in failing to adequately train or supervise its parking attendants. The Church moved for summary judgment on the ground that it did not have a duty to assist Vasilenko with crossing a public street it did not own, possess, or control. The trial court granted the Church summary judgment; a divided panel of the Court of Appeal reversed. We granted review.

## II.

A plaintiff in a negligence suit must demonstrate " 'a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury.' " (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 573 (*Beacon*).) In this case, we decide only whether the Church had a legal duty to prevent the injuries Vasilenko alleges. The existence of a duty is a question of law, which we review de novo. (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770 (*Cabral*).)

Civil Code section 1714, subdivision (a) "establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others." (*Cabral*, *supra*, 51 Cal.4th at p. 768.) " 'Courts . . . invoke[] the concept of duty to limit generally "the otherwise potentially infinite liability which would follow from every negligent act . . . ." ' " (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 (*Bily*).) We have said that "in the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where 'clearly supported by public policy.' "

3

(*Cabral*, *supra*, 51 Cal.4th at p. 771, quoting *Rowland v. Christian* (1968) 69 Cal.2d 108, 112 (*Rowland*).)

In determining whether policy considerations weigh in favor of such an exception, we have looked to "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland*, *supra*, 69 Cal.2d at p. 113.) We do not ask whether these factors (the *Rowland* factors) "support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy." (*Cabral*, *supra*, 51 Cal.4th at p. 772; see Rest.3d Torts, Liability for Physical and Emotional Harm, § 7, com. a, p. 78 ["No-duty rules are appropriate only when a court can promulgate relatively clear, categorical, bright-line rules of law applicable to a general class of cases."].)

In this respect, duty differs from the other elements of a tort. Breach, injury, and causation must be demonstrated on the basis of facts adduced at trial, and a jury's determination of each must take into account the particular context in which any act or injury occurred. Analysis of duty occurs at a higher level of generality. (See *Cabral*, *supra*, 51 Cal.4th at p. 774.) Here, because "the general duty to take ordinary care in the conduct of one's activities" applies to choosing the location of a parking lot for one's invitees and to training one's employees, "the issue is . . . properly stated as whether a categorical exception to that general rule should be made" exempting those who own, possess, or control premises

4

abutting a public street from liability to invitees for placing a parking lot in a location that requires invitees to cross the public street. (*Ibid.*) For conciseness, we refer to those who "own, possess, or control" such premises as "landowners," regardless of their legal title over the property.

This question is related to, but not squarely governed by, the rule that "in the absence of a statute a landowner is under no duty to maintain in a safe condition a public street abutting upon" the landowner's property unless the landowner created the danger. (*Sexton*, *supra*, 39 Cal.2d at p. 157; see Rest.3d Torts, Liability for Physical and Emotional Harm, § 54, com. d, p. 354 ["[N]o one would think that a land possessor [had] a duty of care to others for conditions not caused by the possessor on public highways and streets adjacent to the possessor's land."].) The reason for this rule is that a landowner generally has no right to control another's property, including streets owned and maintained by the government. (*Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 134 ["A defendant cannot be held liable for the defective or dangerous condition of property which it did not own, possess, or control."].)

Consistent with this rule, the Court of Appeal in *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379 (*Owens*) held that the defendant supermarket did not owe a duty to a plaintiff who had been struck by a car on the street outside the supermarket. (*Id.* at pp. 385–388.) The Court of Appeal in *Seaber v. Hotel Del Coronado* (1991) 1 Cal.App.4th 481 (*Seaber*) similarly held that the defendant hotel did not owe any duty to a patron who was struck and killed in a marked crosswalk outside the hotel's entrance. (*Id.* at pp. 492–493; see also *Selger v. Steven Brothers, Inc.* (1990) 222 Cal.App.3d 1585, 1589 [store owed no duty to pedestrian who slipped on another's detritus on the sidewalk outside the store]; *Steinmetz v. Stockton City Chamber of Commerce* (1985) 169 Cal.App.3d 1142, 1147 [business group hosting mixer owed no duty to guest who was stabbed

5

returning to vehicle parked in an off-premise lot the host did not control]; *Nevarez v. Thriftimart, Inc.* (1970) 7 Cal.App.3d 799, 805–806 (*Nevarez*) [supermarket owed no duty to customer who was hit by a car in an adjacent public street while crossing the street to get to the store's grand opening].)

The Church and its amici argue that under this line of authorities, the Church did not owe Vasilenko a duty here, as Vasilenko does not allege that the Church controlled the portion of Marconi Avenue where he was injured. But this case differs from *Owens* and *Seaber*. It is one thing for the owner of an establishment open to the public to have an entrance on a public street. All pedestrians on a public street face some risk of injury, which the landowner has done nothing to increase. It is another matter when the landowner sites and maintains a parking lot on the other side of a public street, so that the landowner's invitees must cross the street in order to reach its premises. In such cases, while the public street itself is no more dangerous, the landowner has increased its invitees' exposure to the specific dangers of that particular street crossing and has thereby increased the likelihood that the invitee will encounter harm at that crossing. The question is whether subjecting an invitee to this exposure should be exempt from the general duty.

### III.

"The *Rowland* factors fall into two categories. Three factors—foreseeability, certainty, and the connection between the plaintiff and the defendant—address the foreseeability of the relevan[t] injury, while the other four—moral blame, preventing future harm, burden, and availability of insurance—take into account public policy concerns that might support excluding certain kinds of plaintiffs or injuries from relief." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1145 (*Kesner*).)

6

## A.

We start with the first group of *Rowland* factors, which assess the foreseeability of the harm to the invitees. It is foreseeable that an invitee directed to park in an overflow lot on the other side of a public street might be struck by oncoming traffic while crossing the street to or from the parking lot, and the Church does not contest that the general type of injury Vasilenko suffered was foreseeable. It is similarly certain that Vasilenko was injured when he was struck by a car and that his injury is compensable at law; this is not a case where the "only claimed injury is an intangible harm." (*Bily*, *supra*, 3 Cal.4th at p. 421.) The first two *Rowland* factors therefore support finding a duty.

The third factor, "the closeness of the connection between the defendant's conduct and the injury suffered" (*Rowland*, *supra*, 69 Cal.2d at p. 113), is "strongly related to the question of foreseeability itself" (*Cabral*, *supra*, 51 Cal.4th at p. 779), but it also accounts for third-party or other intervening conduct. (See *Kesner*, *supra*, 1 Cal.5th at p. 1148.) Where the third party's intervening conduct is foreseeable or derivative of the defendant's, then that conduct does not " 'diminish the closeness of the connection between defendant's conduct and plaintiff's injury. . . .' " (*Ibid.*, quoting *Beacon*, *supra*, 59 Cal.4th at p. 583 and citing *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 58 (*Bigbee*).) In *Kesner*, we found that the defendant's conduct was closely tied to the injuries alleged despite the intervening conduct of the defendant's employees, since the employees' conduct — taking home asbestos fibers in their clothing — was both foreseeable and derivative of the defendant's alleged negligence in failing to control or limit asbestos fibers in the workplace. (*Kesner*, at p. 1148.)

Here, by contrast, the occurrence of injury results from the confluence of an invitee choosing to cross the street at a certain time and place and in a certain manner, and a driver approaching at that moment and failing to avoid a collision.

7

(The parties dispute whether Vasilenko was jaywalking in violation of Sacramento County Code section 10.20.040, but the analysis here does not depend on a determination of that issue.)  There is a foreseeable risk of collision whether or not the invitee or the driver is negligent.  But unless the landowner impaired the driver's ability to see and react to crossing pedestrians, the driver's conduct is independent of the landowner's.  Similarly, unless the landowner impaired the invitee's ability to see and react to passing motorists, the invitee's decision as to when, where, and how to cross is also independent of the landowner's.  Because the landowner's conduct bears only an attenuated relationship to the invitee's injury, we conclude that the closeness factor tips against finding a duty.

**B.**

"[F]oreseeability alone is not sufficient to create an independent tort duty. ' " . . . [The] existence [of a duty] depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability." ' " (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 552.)  These policy considerations include " 'the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved' [citation]." (*Cabral*, *supra*, 51 Cal.4th at p. 781.)  "A duty of care will not be held to exist even as to foreseeable injuries . . . where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability." (*Merrill v. Navegar, Inc*. (2001) 26 Cal.4th 465, 502.)  We first address prevention of future harm, burden, and moral blame, and then discuss the availability of insurance.

8

The policy of preventing future harm is ordinarily served by allocating costs to those responsible for the injury and thus best suited to prevent it. (See *Cabral*, *supra*, 51 Cal.4th at p. 781.) "In general, internalizing the cost of injuries caused by a particular behavior will induce changes in that behavior to make it safer. That consideration may be 'outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability.' [Citation.]" (*Kesner*, *supra*, 1 Cal.5th at p. 1150.)

The ability of landowners to reduce the risk of injury from crossing a public street is limited. "The power to control public streets and regulate traffic lies with the state which may delegate local authority to municipalities. . . ." (*Nevarez*, *supra*, 7 Cal.App.3d at p. 805; see Veh. Code, §§ 21100, 21102.) Only state or local authorities may install traffic control devices on public streets, such as signs, pedestrian crosswalks, or traffic signals. (See Veh. Code, § 21350 et seq.) A landowner can petition the relevant authority to install a traffic control device — indeed, the Church did so here — but the ultimate decision is up to that authority. Nor can a landowner erect signs on its property "which attempt[] to direct the movement of traffic." (Veh. Code, § 21465.) A landowner can place lights on its own premises to improve visibility for pedestrians and drivers. But assuming such lighting is not unlawful (see Veh. Code, § 21466 [prohibiting lighting in view of a public highway that prevents drivers from recognizing official traffic control devices]; *id*. § 21466.5 [prohibiting lighting in view of a public highway that impairs drivers' vision]), it is debatable whether illuminating a landowner's premises would serve to distract drivers more than it would alert them to crossing pedestrians. (See *Donavan v. Jones* (La.Ct.App. 1995) 658 So.2d 755, 759 (*Donavan*) ["The evidence is undisputed that there was no lighting on the

9

roadway, crosswalk or parking lot; the plant itself was brightly lit, but the testimony shows this most likely distracted drivers."].)

Vasilenko contends that landowners could assist invitees in crossing the street. But crossing volunteers are not authorized traffic officers and generally have no authority to direct traffic or otherwise control public streets. (See Sac. County Code, ch. 10.12, § 10.12.020 ["No persons other than traffic officers or persons authorized by law, shall direct traffic by voice, hand/or other signal . . . ."]; Veh. Code, § 21100, subd. (e) [permitting local authorities to appoint traffic officers to regulate traffic].) Further, crossing volunteers may inadvertently convey to invitees that they *do* possess authority to direct traffic and thereby cause invitees to rely on such assistance to their detriment.

Vasilenko also contends that landowners can warn of the danger of crossing the street, perhaps by posting a sign. But the danger posed by crossing a public street midblock is obvious, and there is ordinarily no duty to warn of obvious dangers. (See *Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 119.) Although some fraction of people may fail to appreciate an obvious danger, "to require warnings for the sake of such persons would produce such a profusion of warnings as to devalue those warnings serving a more important function." (Rest.3d Torts, Liability for Physical and Emotional Harm, § 18, com. f, p. 208.)

It is possible that a landowner can reduce the risk of harm by maintaining a parking lot in a location that does not require invitees to cross a public street. We note that landowners already have incentives to provide parking that is safe and convenient for their invitees. Doing so increases the likelihood that invitees will visit the landowners' premises and can help create a positive experience for invitees, increasing the likelihood of repeat visits. Conversely, a landowner's reputation will be damaged if parking is unsafe or inconvenient. But there may be instances where another parking option that did not require crossing a public street

10

was available and would not have been cost prohibitive. Finding a duty here may encourage landowners to choose safer parking options. This approach would be socially desirable if it reduces collisions on the public street, and it is fair to place the costs on landowners to the extent they seek to attract invitees.

But it is likely difficult in many cases to reliably assess which of several parking options was the safest at the time the invitee was directed where to park. The relevant considerations are multitudinous and vary by the hour, day of the week, and month, and many will be hard to establish with accuracy. These considerations include the volume and speed of traffic along the streets in the area, the volume of traffic to and from the landowners' premises and neighboring properties, crime rates and perceptions of safety on the sidewalks, and the location of crosswalks and traffic control devices. The inquiry is further complicated by the natural tendency to think that a lot was unsafe after a collision has occurred. (See *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 987 [defining hindsight bias as the "recognized tendency for individuals to overestimate or exaggerate the predictability of events after they have occurred"].) Although the relative safety of one lot compared to others may sometimes be obvious, it is more typical that a landowner must choose among options with competing advantages and disadvantages, not all of which may be known to the landowner when deciding.

In this case, for example, Vasilenko notes that the Church sometimes directed visitors to park at a business plaza further east along Marconi Avenue on the same side of the street as the Church building. That lot, he says, would have been safer than the swim school lot. But the business plaza lot, though located on the same side of Marconi Avenue as the Church, was on the other side of Root Avenue across which there was no crosswalk or other marked crossing. Even if it could be established that crossing Root Avenue was safer than crossing Marconi Avenue, the business plaza lot was farther away from the Church than the swim

11

school lot.  Directing invitees to the business plaza lot may have increased invitees' exposure to other dangers of the public street as well as the November rain.  If, for example, an invitee had been mugged between the business plaza lot and the Church, or had slipped on a puddle on the sidewalk, that invitee might reasonably argue that the swim school lot would have been safer.  Yet another consideration is that cars parked at a business plaza at night, away from the Church, may have been more at risk of break-ins or carjackings.

In addition to the difficulties in determining the relative safety of alternative parking lots, it is not obvious how to determine whether a safer lot was available.  In this case, Vasilenko contends that the business plaza lot had ample parking the night he was injured.  But unlike with the swim school lot, the Church did not have an agreement for use of the business plaza lot.  Directing invitees to park at a private lot in violation of the lot's restrictions may put them at risk of having their cars towed (see Veh. Code, § 22953) and may even amount to encouraging them to commit trespass (see Pen. Code, § 602, subd. (n)).  Further, if the business plaza lot was not available in this sense, should the Church have tried to obtain a formal agreement with the business plaza?  More generally, what is the relevant marketplace for parking lots that the landowner must assess?  And what is the proper timeframe for assessing that marketplace?  If a purportedly safer lot becomes available after a landowner has entered into an agreement to use another, does the landowner have a duty to cancel the agreement and move to the new lot?  Further, if a safer lot is more expensive, what level of cost is it reasonable to expect the landowner to incur?

We do not mean to suggest that the business plaza lot was actually not available as an alternative or was actually less safe than the swim school lot.  Those questions are not before us.  We discuss the relevant considerations only to illustrate the likely difficulties involved in determining whether a safer alternative

12

was available.  In many cases, these complexities will make it difficult for a landowner to reliably predict which parking lot might be considered a safer available alternative.

We must also account for the possibility that finding a duty in this case will cause some or perhaps many landowners to stop providing parking.  Indeed, Vasilenko argues that the Church should not have used the swim school for evening events when it was raining.  It is not clear that this would result in a net benefit to invitees or to the public at large.  Although landowners are not required to provide parking for their invitees, it is often socially desirable for landowners to do so.  Providing parking reduces traffic and its associated dangers.  Drivers looking for parking may pay less attention to other hazards than they otherwise would.  They may also disrupt the flow of traffic by driving more slowly than other drivers, by stopping periodically to wait for parking spaces to free up, or by speeding up suddenly to capture an available space.  By providing parking, a landowner may decrease its invitees' risk of injury from other dangers of the road as compared to invitees finding their own parking on the streets.

In contrast to landowners, who generally have limited ability to reduce the risk of injury to invitees crossing a public street, other entities such as the government, drivers, and invitees themselves have much greater and more direct ability to reduce that risk.  The public entity that maintains the street can take a wide array of measures to prevent future harm.  For instance, it can install crosswalks, traffic lights, street lights, warning signs, traffic circles, or stop signs.  It can also provide temporary crossing guards authorized to control the flow of traffic.  Drivers and invitees, for their part, are the ones most directly involved in any given collision; they can also take significant steps to reduce the risk of injury.  Drivers can reduce their speed and improve their alertness, and invitees can exercise more care in choosing the precise location and moment they cross.  In

13

view of these considerations, we conclude that the policy of preventing future harm weighs against imposing a duty on landowners here. (See *Kesner*, *supra*, 1 Cal.5th at p. 1153 ["[T]he tort system contemplates that the cost of an injury . . . [is] allocat[ed] . . . to ensure that those 'best situated' to prevent such injuries are incentivized to do so."].)

We turn next to "the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach." (*Rowland*, *supra*, 69 Cal.2d at p. 113.) The foregoing discussion on preventing future harms suggests that imposing a duty on landowners here could result in significant burdens. Landowners that wished to provide or continue providing parking would have to make difficult and complex determinations of availability and relative safety. They would have to continuously monitor the dangerousness of the abutting street and other streets in the area to determine which ones become more or less safe, and they may have to relocate their parking lots as conditions change. They may also need to hire employees to assist invitees with crossing the street.

Recognizing these burdens, Vasilenko argues that he is advocating only for a duty that could be satisfied by "simple, inexpensive, and reasonable" precautions. In particular, he says landowners could inform invitees of a safer alternative or warn invitees not to cross midblock or not use a dangerous lot. But, as explained above, these proposed precautions are unlikely to be as straightforward or beneficial as Vasilenko makes them out to be. We conclude that the burden factor also weighs against imposing a duty.

As to moral blame, we have noted that this factor "can be difficult to assess in the absence of a factual record." (*Kesner*, *supra*, 1 Cal.5th at p. 1151.) As this case comes to us from a grant of summary judgment, the record is not complete. But the record before us does not show the Church's conduct to be particularly

14

blameworthy. We have said that if there were reasonable ameliorative steps the defendant could have taken, there can be moral blame "attached to the defendants' failure to take steps to avert the foreseeable harm." (*Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 814.) As discussed, it is unclear what effective and affordable ameliorative steps a landowner in the Church's position could have taken. We have also said we may assign moral blame "in instances where the plaintiffs are particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue." (*Kesner*, *supra*, 1 Cal.5th at p. 1151.) Here, the danger of crossing public streets is one that almost all adults encounter every day, and landowners have limited ability to reduce the danger and generally exercise no greater control over the danger than the invitees who cross. On the whole, the moral blame factor does not point toward imposition of a duty.

The final *Rowland* factor is the availability and cost of insurance. Vasilenko contends that general commercial liability insurance is readily available to landowners such as the Church, and there is no reason to believe that imposing a duty here would lead to unmanageable increases in premiums. The Church challenges this premise, contending that it is unclear whether insurance would be available to landowners or whether such insurance would be reasonably affordable. Moreover, other forms of readily available insurance may already cover this type of injury; for example, all drivers in California are required to carry personal injury insurance. (Veh. Code, § 16020 et seq.; Ins. Code, § 11580.1, subd. (b).) Insurance is also available to cover injuries resulting from collisions with uninsured or underinsured drivers (Ins. Code, § 11580.2), although these forms of insurance may not cover a pedestrian's injuries if the pedestrian was at fault. Neither party has provided sufficient information to settle the question of insurance one way or the other; we can conclude only that insurance could be

15

available to the landlord, the invitee, and the driver.  We find that the insurance factor weighs neither for nor against imposing a duty here.

In sum, two of the *Rowland* factors — foreseeability and certainty — weigh in favor of finding a duty, while four — closeness, preventing future harm, burden, and moral blame — weigh against duty, with the insurance factor weighing in neither direction.  In assessing duty, however, we do not merely count up the factors on either side.  In this case, the policy of preventing future harm looms particularly large.  In light of the limited steps the landowner can take to reduce the risk to its invitees, especially when compared to the ability of invitees and drivers to prevent injury, and in light of the possibility that imposing a duty will discourage the landowner from designating options for parking, we hold that a landowner who does no more than site and maintain a parking lot that requires invitees to cross a public street to reach the landowner's premises does not owe a duty to protect those invitees from the obvious dangers of the public street.

We are not confronted here with an allegation that some condition of the premises obscured or magnified the risk of harm posed by the street, or that the landowner knows or should have known that its invitees include persons who may not appreciate the danger of the public street, such as unaccompanied children. We express no view on the existence of a duty in such scenarios.

## C.

Like the Court of Appeal, Vasilenko relies on two appellate decisions holding that a landowner can be liable for injury occurring off-premises on an abutting public street, *Barnes v. Black* (1997) 71 Cal.App.4th 1473 (*Barnes*) and *Annocki v. Peterson Enterprises, LLC* (2014) 232 Cal.App.4th 32 (*Annocki*), as well as our decision in *Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139 (*Bonanno*), which involved the placement of a public bus stop. Vasilenko also cites *Schwartz v. Helms Bakery Limited* (1967) 67 Cal.2d 232

16

(*Schwartz*), involving the placement of a street vendor's bakery truck; *Bigbee*, *supra*, 34 Cal.3d 49, involving the placement of a phone booth; and *Johnston v. De La Guerra Properties* (1946) 28 Cal.2d 394 (*Johnston*), involving a dangerous means of ingress to a landowner's premises.

But *Barnes*, *Annocki*, and *Johnston* all involved dangerous conditions on the defendant landowners' premises that the landowners controlled. In *Barnes*, the dangerous condition was a steep driveway in the defendant landlord's apartment complex that let out onto a public street. (*Barnes*, *supra*, 71 Cal.App.4th at p. 1476.) The plaintiffs' child was riding his tricycle on the sidewalk when he lost control and veered into the driveway; the driveway then "ejected" the child and the tricycle into the street, and the child was struck by a car and killed. (*Id.* at pp. 1476, 1479.) In *Annocki*, the dangerous condition was the design and configuration of the defendant restaurant's parking lot, which obscured the fact that exiting drivers could only turn right onto the abutting street. (*Annocki*, *supra*, 232 Cal.App.4th at pp. 34–35.) An exiting patron attempted to turn left and, in doing so, collided with the plaintiffs' son, who died. (*Id.* at p. 34.) And in *Johnston*, the dangerous condition was a walkway the defendant landlord encouraged invitees to use as a means of ingress and egress onto the property from an adjoining parking lot. (*Johnston*, *supra*, 28 Cal.3d at p. 397.) The walkway abutted a low wall on the adjoining lot; the vertical distance between the walkway and the top of the wall varied from six inches to over two feet. (*Ibid.*) The plaintiff parked in the adjoining lot one night and in the dark misjudged the distance between the wall and the walkway, fell, and suffered injury. (*Id.* at p. 398.)

The defendants in *Barnes*, *Annocki*, and *Johnston* were liable because of some defect on the premises they controlled; they violated their duty to keep premises they possessed or controlled in a reasonably safe condition. (See *Alvarez*

17

*v. Vece* (1997) 14 Cal.4th 1149, 1156.)  It was immaterial that the collisions in *Barnes* and *Annocki* occurred in a public street; the landowner's duty in *Barnes* would have been no different if the complex's driveway, instead of leading to a street, ended in a brick wall within the property line.  None of the three cases involved merely the siting of a landowner's premises in relation to a public street.

By contrast, *Bonanno*, *Schwartz*, and *Bigbee* did involve liability for the defendants' selection of the location of the relevant premises.  *Bonanno* did not involve a question of duty under Civil Code section 1714, but rather whether a bus stop accessible only across a dangerous uncontrolled crosswalk constituted a " 'dangerous condition' " of public property within the meaning of Government Code sections 830 and 835.  (*Bonanno*, *supra*, 30 Cal.4th at p. 144.)  Although we looked to *Seaber*, *supra*, 1 Cal. App.4th 481, and *Schwartz*, *supra*, 67 Cal.2d 232, for guidance, those cases involved the duty of private parties, and we declined to hold that "public entity liability under [Government code] section 835 is coextensive with private liability for maintaining property in an unsafe condition." (*Bonanno*, *supra*, 30 Cal.4th at p. 152.)  Rather, *Bonanno* only assessed public entity liability as "set by statute, not common law," and did not apply the *Rowland* factors in question here.  (*Bonanno*, at p. 156.)

Even if *Bonanno* can inform the duty question here, our discussion of *Seaber* and *Schwartz* in that case makes clear that the key consideration in *Bonanno* — the mobile nature of the bus stop — is not present in this case.  We explained that the bus stop in *Bonanno* easily could have been moved to a less dangerous location, an option not available to the hotel in *Seaber*.  (*Bonanno*, *supra*, 30 Cal.4th at p. 152.)  We found that the bus stop was more like the bakery truck belonging to the defendant street vendor in *Schwartz*, who owed a duty to a child patron injured while crossing the street to reach the truck.  Because the vendor could choose where it did business, we reasoned, it could choose the

18

avenues of approach to the truck. (See *Schwartz*, *supra*, 67 Cal.2d at pp. 242–243 & fn. 10.) In this regard, the bus stop in *Bonanno* was also like the phone booth at issue in *Bigbee*, where we said in dicta that a telephone company likely owed a duty to patrons to exercise reasonable care in deciding where to place its phone booths on a public street. (*Bigbee*, *supra*, 34 Cal.3d at p. 55, fn. 8.) But we did not examine the point in any depth; the primary question in *Bigbee* was whether the plaintiff's injuries in that case were unforeseeable as a matter of law. (*Id.* at p. 56.)

Vasilenko argues that *Bonanno*, *Schwartz*, and *Bigbee* are applicable because the Church could effectively "move" the swim school lot by directing invitees to the business plaza lot. But that is not how we understood the mobility of the bus stop in *Bonanno*, the bakery truck in *Schwartz*, or the phone booth in *Bigbee*. The bus stop, bakery truck, and phone booth could have been relocated to any number of unequivocally safer locations with little burden on the defendant. (See *Bonanno*, *supra*, 30 Cal.4th at p. 152 [moving the bus stop one block to a location next to a controlled crosswalk "imposed no undue burden" on the public agency]; *Schwartz*, *supra*, 67 Cal.2d at p. 243 [the bakery truck could have legally parked on the other side of the street, where the plaintiff came from]; *Noon v. Knavel* (Pa.Super.Ct. 1975) 339 A.2d 545, 550–551 [phone booths can be moved to other, safer locations], cited in *Bigbee*, *supra*, 34 Cal.3d at p. 59.) Because the defendants could readily control which parts of the public streets were adjacent to their premises, we found they had a duty to exercise reasonable care in exercising that control. (See *Seaber*, *supra*, 1 Cal.App.4th at pp. 489–490 [discussing the "elastic concept of business premises" of mobile street vendors].) Parking lots, by contrast, cannot be moved so easily, and the burden of identifying alternatives and assessing the multitude of variables affecting their relative safety is not insubstantial. *Bonanno*, *Schwartz*, and *Bigbee* are thus distinguishable from cases

19

involving premises with fixed locations and landowners with no control over the relevant part of the public street.

**D.**

The parties have cited cases from other jurisdictions that have considered the issue before us, and we find that our holding is consistent with the weight of those authorities. In *Davis v. Westwood Group* (Mass. 1995) 652 N.E.2d 567 (*Davis*), for instance, the Supreme Judicial Court of Massachusetts held that the defendant racetrack had no duty to protect invitees crossing a public street between its parking lot and the racetrack. (*Id.* at p. 570.) The court reasoned that imposing a duty would "significantly expand the scope of a landowner or possessor's duties with respect to adjacent public roads, and would make the line which cuts off landowner liability 'nearly impossible to draw.' [Citation.]" (*Id.* at p. 570.) Courts in Illinois, North Carolina, and New York have similarly declined to impose a duty on landowners to protect or warn invitees when the configuration of the landowner's premises requires invitees to cross a public street. (See *Swett v. Village of Algonquin* (Ill.App.3d 1988) 523 N.E.2d 594, 600–602; *Laufenberg v. Golab* (Ill.App.3d 1982) 438 N.E.2d 1238, 1240–1241; *Laumann v. Plakakis* (N.C.App. 1987) 351 S.E.2d 765, 766–767; *Obiechina v. Colleges of the Seneca* (N.Y.Sup.Ct 1996) 171 Misc.2d 56, 60–62.)

Vasilenko observes that some courts in other states have found a duty in somewhat similar circumstances, but we find many of the cases he cites distinguishable. In *Lutheran Hosp. of Indiana v. Blaser* (Ind.Ct.App. 1994) 634 N.E.2d 864, for instance, the defendant hospital was aware of the dangerous condition — the configuration of the hospital's parking lot made it appear as though the lot's driveway was the entrance when in fact it was the exit — and exercised control over the driveway, where the plaintiff's injuries occurred. (*Id.* at pp. 869–870.) *Stephens v. Bashas' Inc.* (Ariz.Ct.App. 1996) 924 P.2d 117, for its

20

part, involved a configuration of the defendant's premises that required drivers to stop in the middle of the street, walk around their trucks, open their doors, walk back around to the cab, then drive across the street in reverse to back into the premises. (*Id.* at p. 119.) These circumstances differ from the situation here, which only involves crossing a public street.

Vasilenko also cites *Donavan*, *supra*, 658 So.2d 755, in which a Louisiana appellate court found that the landowner owed a duty to a construction worker who was struck by a truck while crossing a five-lane highway separating the landowner's construction site from its parking lot in the early morning. (*Id.* at pp. 759–760, 766.) Although at the landowner's request the state had installed a crosswalk, reaching the crosswalk in the dark required "walking over [an] unfamiliar and hazardous . . . unlit, pothole-filled parking lot" and then doubling back once across to reach the construction site entrance. (*Id.* at p. 767.) To the extent that *Donavan* found a duty because the lighting conditions of the parking lot obscured the existence of the crosswalk and where the dangerous condition of the parking lot made it unattractive for invitees to reach the crosswalk, its holding is not inconsistent with the rule proposed here. But we are not persuaded by *Donavan*'s broader conclusion that the defendant owed the plaintiff a duty to provide "reasonably safe access" to the premises (*id*. at p. 766), although the fact that the defendant in *Donavan* was the plaintiff's employer may entail considerations not present here.

Finally, Vasilenko cites *Warrington v. Bird* (N.J.Super.Ct.App.Div. 1985) 499 A.2d 1026 (*Warrington*), but that case relies on law inconsistent with California's. *Warrington* found that the defendant restaurant "had the obligation to exercise reasonable care for the safety of its patrons in passing over the County highway from and to its parking lot," reasoning that "[c]ommercial entrepreneurs know in providing the parking facility that their customers will travel a definite

21

route to reach their premises.  The benefiting proprietor should not be permitted to cause or ignore an unsafe condition in that route which it might reasonably remedy, whether the path leads along a sidewalk or across a roadway." (*Id.* at pp. 1029–1030.)  The court noted that "[t]estimony . . . that lighting placed upon the premises of the restaurant or parking lot might reasonably have illuminated the area and have made motorists more aware of pedestrians crossing the roadway to and from the restaurant and its parking lot.  In addition, if the dangers reasonably required, a sign or flashing signal might have been erected on defendant's premises to alert both motorists and patrons of the dangers." (*Id.* at p. 1030.)

In California, landowners may not place signs that seek to direct the flow of traffic on a public highway, even on their own property, nor may they install lights that distract passing motorists.  (Veh. Code, §§ 21465, 21466.5.)  *Warrington*'s reference to dangers "along a sidewalk" also suggests that in New Jersey landowners are liable for dangers on public streets abutting their premises generally.  (*Warrington*, *supra*, 499 A.2d at p. 1030.)  Indeed, the court in *Mulraney v. Auletto's Catering* (N.J. Super.Ct.App.Div. 1996) 680 A.2d 793 (*Mulraney*) relied on *Warrington* to hold that the defendant landowner had a duty to protect patrons crossing the street from a parking lot the landowner did not control.  (*Mulraney*, at p. 796.)  This result is directly at odds with the holding in *Seaber*, *supra*, 1 Cal.App.4th 481, which found no duty in analogous circumstances, and it is inconsistent with our general rule that "a landowner is under no duty to maintain in a safe condition a public street abutting upon" the landowner's property unless the landowner created the danger.  (*Sexton*, *supra*, 39 Cal.2d at p. 157.)

## IV.

We now apply our holding to the circumstances here.  The available evidence indicates that the section of Marconi Avenue at issue was a regular

22

public street in a metropolitan area. Indeed, after conducting a traffic study, the county declined to install a crosswalk across Marconi Avenue near the Church. California Walks, supporting Vasilenko, observes that within unincorporated Sacramento County, Marconi Avenue had a relatively high number of pedestrian-vehicle collisions per mile between 1996 and 2001. But the data amici cite do not indicate that Marconi Avenue was particularly dangerous even by the standards of Sacramento County. Nor did the county identify the intersection of Marconi Avenue and Root Avenue as one with a high number of collisions during that time period.

Vasilenko also does not contend there were any dangerous conditions within the parking lot that magnified or obscured the danger posed by Marconi Avenue. He does not allege, for instance, that the swim school lot or the main Church premises were inadequately lit. Unlike in *Barnes*, there was nothing that caused Vasilenko to be "ejected" uncontrollably into the middle of Marconi Avenue. (*Barnes*, *supra*, 71 Cal.App.4th at p. 1479.) Nor does Vasilenko allege that the Church or its parking attendants represented to him that Marconi Avenue was safer than it actually was or safer than crossing at the intersection with Root Avenue. The record indicates that the street was lit only at the intersection, which was at most 100 feet away. Although Vasilenko claims he "required assistance and instruction" from the Church's parking attendants, he does not explain how such assistance or instruction would have served any purpose beyond warning him of the obvious danger of crossing Marconi Avenue midblock. Finally, Vasilenko does not allege that the Church's invitees routinely include unaccompanied persons who are incapable of appreciating the obvious danger of the public street; Vasilenko certainly does not claim to be such a person.

In sum, Vasilenko does not allege that the Church has done anything more than site and maintain a parking lot that requires its invitees to cross a public

23

street.  We thus conclude that the Church owed Vasilenko no duty to protect him from the obvious dangers of crossing Marconi Avenue.

## V.

Vasilenko argues that the Court of Appeal's decision should be affirmed on the alternative ground that the Church voluntarily assumed a duty to assist him in crossing Marconi Avenue.  This argument was not presented to the trial court, and although the parties briefed it before the Court of Appeal, that court found the Church owed Vasilenko a duty under Civil Code section 1714 and did not reach the alternative argument.  We granted review only on the issue of a landowner's duty to its invitees when it directs those invitees to use its parking lot across the street.  We decline to address whether the Church, by its alleged actions, voluntarily assumed a duty.  The Court of Appeal on remand may consider this argument if Vasilenko elects to pursue it.

24

We reverse the decision of the Court of Appeal and remand to that court for further proceedings consistent with this opinion.

**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**JONES, J.\***

---

\*      Presiding Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Vasilenko v. Grace Family Church

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 248 Cal.App.4th 146
**Rehearing Granted**

_____

**Opinion No.** S235412
**Date Filed:** November 13, 2017

_____

**Court:** Superior
**County:** Sacramento
**Judge:** David I. Brown

_____

**Counsel:**

Torrano Law, Frank J. Torrano; Jaramillo & Borcyckowski and Robert D. Borcyckowski for Plaintiffs and Appellants.

C. Athena Roussos; Law Office of Louinda V. Lacey and Louinda V. Lacey for California Walks as Amicus Curiae on behalf of Plaintiffs and Appellants.

McKay, de Lorimier & Acain, Paul A. de Lorimier, Janet S. Yoon; The Thomas Law Firm, Mason Thomas, Bradley S. Thomas and Kelly Thomas for Defendant and Respondent.

Horvitz & Levy, Mitchell C. Tilner, Eric S. Boorstin, Lacey L. Estudillo; Gorden & Rees and Don Willenburg for Association of Southern California Defense Counsel and Association of Defense Counsel of Northern California and Nevada as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Frank J. Torrano
Torrano Law
8801 Folsom Boulevard, Suite 230
Sacramento, CA  95826
(916) 801-5577

Paul A. de Lorimier
McKay, de Lorimier & Acain
3250 Wilshire Boulevard, Suite 603
Los Angeles, CA  90010-1578
(213) 386-8900

Eric S. Boorstin
Horvitz & Levy
3601 West Olive Avenue, 8th Floor
Burbank, CA  91505-4681
(818) 995-0800